# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, *et al.*,[1]<br><br>                   Debtors. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br>(Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS,<br><br>           Plaintiff,<br><br>          v.<br>YUCAIPA AMERICAN ALLIANCE FUND I, LLC, YUCAIPA AMERICAN MANAGEMENT, LLC, AMERICAN AIRLINES MASTER FIXED BENEFIT PENSION PLAN TRUST, AMERICAN PRIVATE EQUITY PARTNERS II, LP, AUTOMOTIVE MACHINISTS PENSION TRUST, BOARD OF FIRE AND POLICE PENSION COMMISSIONERS OF THE CITY OF LOS ANGELES, CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, CARPENTERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA, COLLER PARTNERS 702 LP INCORPORATED, CLOUSE S.A., CONSOLIDATED RETIREMENT FUND, IAM PRIVATE EQUITY, LLC, ILGWU DEATH BENEFIT FUND 4, INTERNATIONAL SIF SICAV SA,  LOCALS 302 & 612 OF THE INTERNATIONAL UNION OF OPERATING ENGINEERS – EMPLOYERS | Adv. Proc. No. _____ |

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) (58-0360550); AAINC Corporation (f/k/a Allied Automotive Group, Inc.) (58-2201081); AFBLLC LLC (f/k/a Allied Freight Broker LLC) (59-2876864); ASCCO (Canada) Company (f/k/a Allied Systems (Canada) Company) (90-0169283); ASLTD L.P. (f/k/a Allied Systems, Ltd. (L.P.) (58-1710028); AXALLC LLC (f/k/a Axis Areta, LLC) (45-5215545); AXCCO Canada Company (f/k/a Axis Canada Company) (875688228); AXGINC Corporation (f/k/a Axis Group, Inc.) (58-2204628); Commercial Carriers, Inc. (38-0436930); CTSINC Corporation (f/k/a CT Services, Inc.) (38-2918187); CTLLC LLC (f/k/a Cordin Transport LLC) (38-1985795); F.J. Boutell Driveway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).  Debtors address for service of process is 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

1

CONSTRUCTION INDUSTRY RETIREMENT TRUST, LOS ANGELES CITY EMPLOYEES' RETIREMENT SYSTEM, NATIONAL RETIREMENT FUND, NEW MEXICO STATE INVESTMENT COUNCIL, NEW MEXICO STATE INVESTMENT COUNCIL LAND GRANT PERMANENT FUND, NEW MEXICO STATE INVESTMENT COUNCIL SEVERANCE TAX PERMANENT FUND, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY POLICE PENSION FUND, NORTHEAST CARPENTERS PENSION FUND, PACIFIC COAST ROOFERS PENSION PLAN, SANBA II INVESTMENT AUTHORITY, STATE STREET BANK AND TRUST COMPANY (AS TRUSTEE ON BEHALF OF AMERICAN AIRLINES MASTER FIXED BENEFIT PENSION PLAN TRUST); STEAMSHIP TRADE ASSOCIATION OF BALTIMORE, INC. – INTERNATIONAL LONGSHOREMEN'S ASSOCIATION (AFL-CIO) PENSION FUND, TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION PENSION PLAN FOR EMPLOYEES, WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST

Defendants.

**LITIGATION TRUSTEE'S COMPLAINT TO (I) AVOID AND RECOVER AVOIDABLE TRANSFERS, AND (II) FOR A DECLARATION OF LIABILITY AGAINST YUCAIPA AMERICAN ALLIANCE FUND I, LLC**

Plaintiff Catherine E. Youngman, in her capacity as the Litigation Trustee and Plan Administrator (the "**Trustee**") for ASHINC Corp. (formerly known as Allied Systems Holdings, Inc.) and related Debtors ("**Allied**" or the "**Company**"), by and through her undersigned counsel, hereby files this Complaint.

## INTRODUCTION

1.      The Trustee is a judgment creditor against Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (together "**Yucaipa**") in the amount of $132,431,957.00, plus accruing post-judgment interest, pursuant to a Judgment entered by the United States Bankruptcy Court for the District of Delaware on June 23, 2021 (the "**Judgment**") in two related "**Adversary Proceedings**": (i) Del. Bankr. Adv. 13-50530 (the "**Estate Action**") and (ii) Del Bankr. Adv. Adv. 14-50947 (the "**Lender Action**") (together the "**Adversary Proceedings**").

2.      Yucaipa has not satisfied the Judgment and it has represented in court filings and post-Judgment discovery responses that it does not have assets sufficient to pay the Judgment (let alone sufficient assets to cover the far larger liability it continues to face with respect to claims remaining for trial in the Adversary Proceedings).

3.      Yucaipa's inability to satisfy the Judgment is the function of it brazenly transferring nearly $380 million to its investors (including to insiders) over the past several years notwithstanding the massive liability presented by the Adversary Proceedings and applicable law restricting such transfers.

4.      Yucaipa's transfers to these transferee-defendants (the "**Transferee Defendants**" or "**Defendants**") were made at a time when, among other things, (i) a string of adverse rulings against Yucaipa had issued in the Adversary Proceedings and related proceedings and appeals,

1

(ii) Yucaipa was enmeshed in a lawsuit with insurance carriers over their denial of coverage for Yucaipa and its employees in connection with the Adversary Proceedings and related actions, and (iii) it had already incurred legal-related expenses far exceeding $20 million. With legal challenges mounting in the face of the Trustee's claims to recover hundreds of millions of dollars, Yucaipa's transfers to the Transferee Defendants — leaving it insolvent — was a naked and intentional attempt to hinder, delay or defraud the Trustee's efforts and abilities to collect upon any judgment entered in the Adversary Proceedings.

5.     The transfers to Transferee Defendants were also not made in return for any reasonably equivalent value at a time when Yucaipa was insolvent or resulted in Yucaipa's insolvency.

6.     Thus, the transfers are subject to avoidance and return to the Trustee — to the extent needed to satisfy the Judgment or subsequent judgment entered — by way of this action.

7.     By way of this action, the Trustee also seeks a declaration that Yucaipa's General Partner — Yucaipa American Fund I, LLC — is liable for the Judgment and any subsequent judgments rendered in favor of the Trustee against Yucaipa in the Adversary Proceedings and that it is required to seek return of the transfers pursuant to the Partnership Agreements.

## JURISDICTION AND VENUE

8.     Pursuant to the Modified First Amended Joint Chapter 11 Plan of Reorganization (the "**Plan**")[2] confirmed in *In re ASHINC Corp.*, Case no. 12-11564 (CSS) (Bankr. Del.) (the "**Bankruptcy Case**"), the Trustee was appointed a representative of the Debtors' Estates to prosecute, among other things, all claims asserted in the Adversary Proceedings and any additional claims of the Debtors' Estates arising out of or related thereto, including against any

---

[2]     All terms not defined shall have the definitions ascribed to the in the Plan.

2

defendants not named therein.

9.      Under the Plan, this Court retained exclusive jurisdiction over all matters arising out of, and related to, the Bankruptcy and the Plan, including, among other things to: (i) hear and determine any and all adversary proceedings arising out of, under, or related to the Litigation Claims; (ii) enforce all orders, judgments, and rulings entered in connection with the Bankruptcy Case or contemplated by the Plan; and, (iii) recover all assets of the Debtors and property of the Estates, wherever located.

10.     As required under Fed. R. Bankr. P. 7008, the Trustee states that this adversary proceeding relates to the Bankruptcy Case — *i.e.*, the Chapter 11 case of *In re ASHINC Corp.,* No. 12-11565 (CSS), pending in the District of Delaware.  This action proceeds as an adversary proceeding, pursuant to Fed. R. Bankr. P. 7001, in that it is a proceeding to recover money or property; seeks equitable relief (including, without limitation, the avoidance of transfers); and seeks to obtain a declaratory judgment.

11.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1334(b) in that the action relates to, and arises in the Bankruptcy Case.  Additionally, this action proceeds as an element of the implementation and execution of the Plan confirmed by this Court in the Bankruptcy Case, including the prosecution of the Litigation Claims.

12.     Additionally, this Court may employ FED. R. CIV. P. 69(a)(1), made applicable through FED. R. BANKR. P. 7069, to enforce its Judgment and/or authority do so pursuant to its supplemental and ancillary jurisdiction.

13.     This Court can assert personal jurisdiction over each of the Defendants pursuant to each of 10 Del. C. § 3104, principles of long-arm jurisdiction; and FED. R. BANKR. P. 7004.

14.     Venue is proper pursuant to each of 28 U.S.C. § 1409(a), 28 U.S.C. § 1391(b)(2),

and the Plan.

15.     This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and (H).

16.     This is also a proceeding in which a bankruptcy Judge has the constitutional power to enter a final order.  Without limiting the certainty of the foregoing, the Trustee consents to entry of final orders or judgment by the bankruptcy court.

## THE PARTIES

### The Plaintiff

17.     The Trustee, as Plaintiff in this adversary proceeding on behalf of Debtors' Estates, was appointed pursuant to the Plan and a Litigation Trust Agreement referred to therein.

### Yucaipa Transferee Defendants

18.     Upon information and belief, Yucaipa American Alliance Fund I, LLC (the "**General Partner**") is a Delaware limited liability company registered at 1209 Orange Street, Wilmington, Delaware c/o The Corporate Trust Company and headquartered at 9130 West Sunset Boulevard, Los Angeles, California.

19.     Upon information and belief, Yucaipa American Management, LLC is a Delaware Limited Liability Company registered at 1209 Orange Street, Wilmington, Delaware c/o The Corporate Trust Company and headquartered at 9130 West Sunset Boulevard, Los Angeles, California.

### Outside Transferee Defendants

20.     Upon information and belief American Airlines Master Fixed Benefit Pension Plan Trust is a corporate pension plan headquartered at 4333 Amon Center Boulevard, Fort Worth, Texas

21.     Upon information and belief American Private Equity Partners II, LP is a

4

Delaware Limited Partnership registered at 1209 Orange Street, Wilmington, Delaware c/o The

Corporate Trust Company and headquartered at 4151 Amon Carter Boulevard, MD 2450, Fort

Worth, TX 7615.

22.    Upon information and belief Automotive Machinists Pension Trust is a private

pension plan administered through Welfare and Pension Administration Service, Inc.,

headquartered at 7525 SE 24th Street, Suite 200, Mercer Island, Washington.

23.    Upon information and belief Board of Fire and Police Pension Commissioners of

the City of Los Angeles is a public pension fund headquartered at 701 E. 3rd Street, Suite 200,

Los Angeles, California.

24.    Upon information and belief California Public Employees' Retirement System

("**CalPERS**") is a public pension fund headquartered at Lincoln Plaza North, 400 Q Street,

Sacramento, California.

25.    Upon information and belief Carpenters Pension Trust for Northern California is a

private pension fund headquartered at 265 Hegenberger Road, Suite 100, Oakland, CA 94621.

26.    Upon information and belief Coller Partners 702 LP Incorporated is Guernsey

limited partnership registered at P.O. Box 255, Trafalgar Court, Les Banques, St. Peter Port,

GY1 3QL, Guernsey.

27.    Upon information and belief Clouse S.A.is an investment fund headquartered at

51 Avenue J F Kennedy, L1855, Luxembourg.

28.    Upon information and belief Consolidated Retirement Fund is a defined benefit

pension fund headquartered at 333 Westchester Avenue, White Plains, New York.

29.    Upon information and belief IAM Private Equity LLC is a Delaware entity

managed by Amalgamated Bank which is headquartered at 275 7th Avenue, New York, New

York.

30.     Upon information and belief ILGWU Death Benefit Fund 4 is a private fund

headquartered at 333 Westchester Avenue, White Plains, New York.

31.     Upon information and belief SIF SICAVC SA is a private fund headquartered at 2

rue Jean Bertholet, Luxembourg, 1233, Luxembourg.

32.     Upon information and belief Locals 302 & 612 Operating Engineers Retirement is

a private pension fund headquartered at 7525 SE 24th Street, Suite 200, Mercer Island,

Washington.

33.     Upon information and belief Los Angeles City Employees' Retirement System is

a public pension fund headquartered at 202 W. First Street, Suite 500, Los Angeles, California.

34.     Upon information and belief National Retirement Fund is a retirement fund

headquartered at 333 Westchester Avenue, White Plains, New York.

35.     Upon information and belief, New Mexico State Investment Council is an

institutional investment firm headquartered at 41 Plaza La Prensa, Santa Fe, New Mexico that

serves as trustee of, and is responsible for, the Land Grant Permanent Fund and the Severance

Tax Fund

36.     Upon information and belief New Mexico State Investment Council Land Grant

Permanent Fund is a public fund headquartered at 41 Plaza La Prensa, Santa Fe, New Mexico.

37.     Upon information and belief New Mexico State Investment Counsel Severance

Tax Permanent Fund is a public fund headquartered at 41 Plaza La Prensa, Santa Fe, New

Mexico.

38.     Upon information and belief New York City Employees' Retirement System

("**NYCERS**") is a public pension fund headquartered at 335 Adams Street, Suite 2300,

Brooklyn, New York.

39.     Upon information and belief New York City Fire Department Pension Fund is a public pension fund headquartered C/O The Bureau of Asset Management City of the New York Office of the Comptroller at 1 Centre Street, New York, New York

40.     Upon information and belief New York City Police Pension Fund is a public pension fund headquartered at 233 Broadway, New York, New York.

41.     Upon information and belief Northeast Carpenters Pension Fund is a New Jersey non-profit corporation headquartered at 91 Fieldcrest Avenue, 3rd Floor, Edison, New Jersey.

42.     Upon information and belief Pacific Coast Roofers Pension Plan is a private pension plan headquartered at 6800 Santa Teresa Boulevard, Suite 100, San Jose, CA 95119.

43.     Upon information and belief Sanba II Investment Company is a private investment company headquartered at Al Corniche Street, PO Box 23224, Doha Qatar.

44.     Upon information and belief State Street Bank and Trust Company, which serves as Trustee on behalf of the American Airlines Master Fixed Benefit Pension Plan and received transfers at issue in this Complaint, is headquartered at One Lincoln Street, Boston, Massachusetts.

45.     Upon information and belief Steamship Trade Association of Baltimore, Inc. – International Longshoremen's Association (AFL-CIO) Pension Fund is a private pension fund administered by STA-ILA Pension Funds which is headquartered at Holabird Business Park, 6610 Tributary Street, Baltimore, Maryland.

46.     Upon information and belief Teachers' Retirement System of the City of New York is a public pension fund headquartered at 55 Water Street, New York, New York.

47.     Upon information and belief United Food and Commercial Workers International

7

Union Pension Plan for Employees is a private pension plan headquartered at 1775 K Street, NW, Washington, DC 20006.

48.     Upon information and belief Western Conference of Teamsters Pension Trust is a private pension trust fund headquartered at 2323 Eastlake Avenue, Seattle, Washington.

**Defendants Are Proper Parties**

49.     All Defendants are properly joined in this action pursuant to Rule 20 of the Federal Rules of Civil Procedure — made applicable by Rule 7020 of the Federal Rules of Bankruptcy Procedure — because the right to relief asserted against all Defendants arises out of the same transaction, occurrence, or series of transactions and occurrences, and there are questions of law and fact common to all Defendants.

**FACTUAL ALLEGATIONS AND BACKGROUND**

I.    **YUCAIPA AND ITS PARTNERSHIP AGREEMENTS**

50.     Defendants are sophisticated commercial parties who elected to invest in Yucaipa pursuant to Partnership Agreements entered into as of March 4, 2005.[3]

51.     The Partnership Agreements' stated objective is to seek realization of "substantial capital gains" from private equity and/or equity-like transactions primarily in the range of $250 million to $1 billion.

52.     Under the Partnership Agreements, the General Partner is responsible for Yucaipa's investment decisions and engaging in activities that, "in its sole discretion" it "deems

---

[3]     Yucaipa American Alliance Fund I, LP's operative Partnership Agreement is the Third Amendment and restated Limited Partnership Agreement entered into as of March 4, 2005, and Yucaipa American Alliance (Parallel) Fund I, LP's operative Partnership Agreement is the Amended and Restated Limited Partnership Agreement entered into as of March 4, 2005.  These agreements are substantively identical and are referred to collectively as the "**Partnership Agreements**" for purposes of this Complaint.

8

necessary, advisable or incidental" to Yucaipa. The General Partner is also responsible for determining in good faith the Partnership's "Available Assets" which are defined as "excess of cash, cash equivalent items and temporary Investments held by the Partnership over the sum of the amount of such items determined by the General Partner to be reasonably necessary for the Payment of the Partnership's expenses, liabilities, and other obligations (whether fixed or contingent), and for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Partnership's business."

53.    Under the Partnership Agreements, distributions to the Transferees were permitted "only to the extent of Available Assets and in compliance with the [Delaware Revised Uniform Limited Partnership] Act and other applicable law."

## II.    YUCAIPA'S INVESTMENT AND CONTROLLING STAKE IN ALLIED

### A.    Yucaipa's Initial Investments in Allied

54.    Allied was a unionized car hauling company engaged in the transport of new vehicles in North America.

55.    On July 31, 2005, Allied filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Georgia (the "**2005 Bankruptcy**").

56.    In early 2006, Yucaipa started analyzing a potential investment in Allied.

57.    Yucaipa thereafter elected to purchase approximately 66% of Allied's then outstanding $150 million in pre-petition senior notes for $81.6 million in May 2006.  Yucaipa also financed Allied's purchase of used rigs for approximately $12.6 million, and later purchased $1.5 million in claims tendered by unsecured creditors for 25¢ on the dollar.  Yucaipa's initial

9

investments in Allied totaled approximately $95 million.

58.     Allied emerged from the 2005 Bankruptcy in 2007 under a Plan of Reorganization sponsored by Yucaipa and the International Brotherhood of Teamsters.  Yucaipa converted its $95 million investment in Allied into 67% of the reorganized Allied's equity and obtained the ability to control Allied's Board of Directors (the "**Board**"), with the right to appoint three of Allied's five Board members and Allied's Chief Executive Officer (the fourth Board member), and a veto power over Allied's fifth Board member, who was selected by Allied's Creditors' Committee from the 2005 Bankruptcy.

59.     Yucaipa appointed three of its partners to the Board and retained an executive search firm to find a new CEO and fourth Board member of the Company.  The fifth and final member of the Allied Board was nominated by the Creditors' Committee and appointed after Yucaipa had rejected two prior selections.

### B.     Allied's Financing Upon Exiting the 2005 Bankruptcy

60.     On May 29, 2007, Allied emerged from the 2005 Bankruptcy with $315 million in exit financing in a two-tiered structure with various lenders (the "**Lenders**") composed of a $265 million senior secured priority "**First Lien Facility**" and $50 million junior "**Second Lien Facility**" consisting of second lien term loans.[4]

61.     The First Lien Facility consisted of three types of debt: (1) term loans in the aggregate principal amount of $180 million, (2) a $35 million revolving credit facility from CIT Group/Business Credit, Inc. ("**CIT**"), and (3) $50 million in letters of credit.  CIT also served as the Administrative Agent and Collateral Agent for the First Lien Facility.

---

[4]     The First Lien Credit Agreement and Second Lien Credit Agreement are collectively referred to as the "**Credit Agreements**" in this Complaint.

62.    The First Lien Facility and Second Lien Facility were secured by a pledge of substantially all of Allied's assets, and both Credit Agreements contained fixed interest rates.

63.    The Georgia bankruptcy court approved Allied's entry into both the First Lien Facility and Second Lien Facility.

64.    The court-approved Credit Agreements both expressly excluded Yucaipa from being an "Eligible Assignee."  This meant that Lenders could not sell, assign, or transfer any portion of their debt, rights, or obligations to Yucaipa.  Further, the Credit Agreements provided for a "**Requisite Lender**" that was entitled to take certain actions and exercise particular remedies (or refrain from doing so) on behalf of all Lenders.  Under the Credit Agreements, the Requisite Lender was one or more Lenders holding more than 50% of the outstanding loans.  Given that Yucaipa could not be an "Eligible Assignee" under the Credit Agreements, it was plainly precluded from serving as a Requisite Lender.

### C.    Yucaipa's Faltering Investment in Allied and the Third Amendments to the Credit Agreements

65.    Shortly after exiting the 2005 Bankruptcy in May 2007, Allied's financial condition once again began to deteriorate.

66.    In early 2008, Yucaipa began exploring the possibility of purchasing Allied's bank debt — then trading significantly below par — given what it perceived as a "dislocation in the marketplace" and in an effort to potentially de-lever Allied's balance sheet.  Because the Credit Agreements did not permit Yucaipa to be an "Eligible Assignee," however, any such purchase first required amending the Credit Agreements.

67.    On April 17, 2008, Allied — with the requisite consent of CIT and the majority of the First Lien Lenders — agreed to the Third Amendment to the First Lien Credit Agreement (the "**Third Amendment**").  Under the Third Amendment, Yucaipa and its affiliates were

11

permitted to purchase Allied's First Lien debt within specified limits and only if it satisfied

stringent contractual conditions, including:

    a.  **Purchase Limits.** The amount of Term Loans that Yucaipa could acquire was limited to the lesser of 25% of the total Term Loan Exposure (as defined in the Credit Agreements) or $50 million, and Yucaipa was barred from acquiring any Letter of Credit Commitments.

    b.  **No Voting Rights or Right to Act as Requisite Lenders.** The voting rights Yucaipa would otherwise have as a Lender were restricted "for all purposes" under the Third Amendment, and Yucaipa — as a "Restricted Sponsor Affiliate[]" — remained barred from serving as Requisite Lender.

    c.  **Mandatory Capital Contribution.** Yucaipa was required to make a capital contribution to Allied in an amount equal to 50% of the aggregate principal amount of any Term Loans it acquired, within 10 days of the acquisition (the "**Capital Contribution**").

    d.  **Covenant Not to Sue.** Yucaipa's legal rights against the Lenders were restricted through a covenant not to sue specific to it.

68.    A Third Amendment to the Second Lien Facility was adopted on April 30, 2008. Unlike the Third Amendment to the First Lien Facility, the amendment to the Second Lien Facility placed no restrictions on Yucaipa purchasing Second Lien Debt and gave Yucaipa the unilateral option of converting some, or all, of its Second Lien holdings into equity.

69.    In or around April 30, 2008, Yucaipa purchased $40 million of Second Lien Debt — at significantly sub-par pricing — and converted $20 million of those debt holdings into Allied preferred stock. Upon conversion and cancellation of this debt, Allied's Second Lien Facility was reduced to $30 million and Yucaipa's equity stake in the Company increased to slightly over 71%.

70.    Yucaipa's contribution and subsequent cancellation of Second Lien Debt did not create sufficient liquidity for the Company to satisfy its obligations to the First Lien Lenders. By June 2008, Allied had defaulted on covenant provisions of the First Lien Credit Agreement

and was issued a Notice of Default and Reservation of Rights from CIT, as Agent for the First Lien Lenders, on September 3, 2008.

71.    Allied and several First Lien Lenders then entered into a Forbearance Agreement while they attempted to negotiate and address ongoing defaults.  This Forbearance Agreement expired in mid-November 2008 without any agreement to restructure Allied's debt or cure its defaults, thus leaving the Lenders free to exercise remedies including accelerating their loans.

72.    Acceleration of the First Lien Debt following the expiration of the Forbearance Agreement would invariably have rendered Yucaipa's equity investment worthless, creating a significant loss for Defendants.

## III.    YUCAIPA'S ATTEMPTS TO BECOME REQUISITE LENDER

73.    With its Allied investment in peril, Yucaipa took aim at acquiring a majority of the First Lien Debt so it, ostensibly, could assume Requisite Lender position and control the exercise of remedies (or lack thereof) provided for under the First Lien Credit Agreement.

74.    Yucaipa's goal of obtaining a majority of Allied's First Lien Debt, however, required an amendment to the First Lien Credit Agreement to remove the restrictions now embodied in the Third Amendment.

75.    In an effort to achieve this objective, Allied and Yucaipa launched a tender offer on February 4, 2009, whereby Yucaipa sought to purchase any and all outstanding Allied First Lien Debt at approximately 26 cents on the dollar (the "**Tender Offer**").  This Tender Offer was conditioned, however, on 51% of the First Lien Lenders accepting the offer and agreeing to a fourth amendment to the First Lien Credit Agreement permitting Yucaipa to hold and vote First Lien Debt without any of the restrictions imposed by the Third Amendment.

76.    In a letter dated February 12, 2009, counsel for the First Lien Agent (CIT) wrote

126886857.1

to Allied and Yucaipa that the fourth amendment proposed with the Tender Offer "may not be consummated on its present terms without the consent of each Agent" and advised that "CIT will not grant consent, whether in its capacity as a Lender or as an Agent, to the Proposed Fourth Amendment."

77.    Neither Allied nor Yucaipa ever responded to the February 12, 2009, letter from CIT's counsel, and the Tender Offer was ultimately unsuccessful.

78.    On or about February 21, 2009, ComVest Investment Partners ("**ComVest**") — who had been separately negotiating with Allied's First Lien Lenders — successfully acquired more than 50% of Allied's First Lien Debt, becoming Requisite Lender under the First Lien Credit Agreement.

79.    Over the course of the next six months, Yucaipa negotiated directly with ComVest in an effort to purchase ComVest's majority stake in the First Lien Debt.  As with the Tender Offer, every transaction Yucaipa contemplated or proposed with ComVest required Allied and ComVest to enter an amendment removing the restrictions set forth in the Third Amendment.

80.    On August 21, 2009, Yucaipa and ComVest entered a Loan Purchase Agreement (the "**LPA**"), pursuant to which Yucaipa purchased ComVest's $145.1 million (principal face amount) for approximately $43 million.  Allied was not a party to the LPA, but the LPA's Closing Conditions required Allied to: (1) reimburse ComVest $1.85 million for its associated legal fees and expenses, (2) reimburse Yucaipa $831,325.83 for its legal fees and expenses, and (3) agree to the later-voided Fourth Amendment to the First Lien Credit Agreement (the "**Fourth Amendment**").

81.    Yucaipa did not make any capital contribution to Allied following its acquisition

of ComVest's First Lien Debt.

82.    When the LPA was entered, the legality of the Fourth Amendment had already

been brought into question by CIT — in its capacity as a Lender and Agent under the First Lien

Facility — in its February 2009 letter.  Allied's counsel had also previously advised that any

Fourth Amendment would "likely result in litigation against the Company," with Yucaipa as "the

primary target of that litigation."

83.    Knowing that the Fourth Amendment would face legal challenges, Yucaipa was

developing a "Contingency Plan" focused on the "Validity of Amendment No. 4" with its

litigation counsel contemporaneous with the execution of the LPA and Fourth Amendment.

## IV.    LITIGATION OVER THE FOURTH AMENDMENT AND ALLIED'S BANKRUPTCY

84.    In the fall of 2009, Yucaipa sent direction letters to CIT claiming it was the

"Requisite Lender" in connection with the First Lien Credit Agreement.

85.    CIT refused to recognize Yucaipa as Requisite Lender and, as such, did not abide

by the directives Yucaipa issued.  In response, Yucaipa, together with Allied, sued CIT in

Georgia state court seeking, among other things, a declaratory judgment holding that the Fourth

Amendment was valid and that Yucaipa was Requisite Lender under the First Lien Credit

Agreement (the "**Georgia Action**").

86.    On December 21, 2009, CIT filed counterclaims in the Georgia Action seeking,

among other things, a declaratory judgment that (i) the purported Fourth Amendment was

ineffective, (ii) the Third Amendment remained in full force and effect, and (iii) Yucaipa could

not be "Requisite Lenders" under the First Lien Credit Agreement.  CIT further sought specific

performance on behalf of the First Lien Lenders requiring Yucaipa to perform all of its

covenants and agreements in accordance with the Third Amendment to the First Lien Credit

126886857.1

Agreement, including the mandatory Capital Contribution.

87.    In December 2011, CIT settled the Georgia Action on its own behalf, but expressly not on behalf of any of Allied's other Lenders.

88.    On January 18, 2012, First Lien Lenders BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (collectively, "**Black Diamond**"), and Spectrum Investment Partners, L.P. ("**Spectrum**" and together with Black Diamond, "**BD/S**"), filed a lawsuit in New York State Court seeking a declaration that the Fourth Amendment was invalid and that Yucaipa was not the Requisite Lender (the "**NY Action**").

89.    On August 27, 2012, BD/S filed a motion for summary judgment in the NY Action, arguing that the Fourth Amendment was not validly enacted because it had the effect of changing the definition of Requisite Lenders and, therefore, it was an amendment requiring the unanimous consent of all the Lenders under the First Lien Credit Agreement.

90.    On November 19, 2012, Justice Ramos of the New York Court ruled from the bench and granted summary judgment in favor of BD/S, nullifying the Fourth Amendment.  The New York Court observed that the Fourth Amendment was an impermissible attempt for Yucaipa to give itself "a free hand" and the ability to exercise "dictatorial powers with regard to [the] loan."

91.    On March 8, 2013, Justice Ramos issued a written opinion to "amplify[y]" the oral ruling issued on November 19, 2012.  In this published opinion, Justice Ramos concluded, among other things, that: (1) Yucaipa caused Allied to enter into the Fourth Amendment, which was "flatly prohibited under the Credit Agreement;" (2) the Fourth Amendment "is not, and

never was, effective;" and (3) "Yucaipa [was] not the Requisite Lender."[5]

92.     The First Department of the New York Supreme Court's Appellate Division (the

"**First Department**") affirmed Justice Ramos' findings that the Fourth Amendment was void *ab*

*initio* and that Yucaipa is not the Requisite Lender.[6]  The New York Court of Appeals denied

further review on April 3, 2014, thereby exhausting Yucaipa's appeals.[7]

93.     On May 17, 2012, while the NY Action was ongoing, BD/S filed an involuntary

petition for bankruptcy against Allied.  That filing was precipitated by Yucaipa's refusal to agree

to First Lien Lenders being treated ratably in a potential sale of Allied debt holdings to Allied's

competitor Jack Cooper Transport ("**JCT**").  At the time, Yucaipa was continuing to rely on its

fictitious Requisite Lender position to demand JCT pay it a significant premium to what was

contemporaneously being offered to other Lenders, including BD/S.

94.     On June 10, 2012, Allied consented to entry of an order for relief and all Debtors

filed voluntary petitions for relief in the Bankruptcy Case.

## V.     The Adversary Proceedings and Adverse Rulings Against Yucaipa

95.     The Estate Action was commenced against Yucaipa, and others, by Allied's

Official Committee of Unsecured Creditors (the "**Committee**") on February 1, 2013, and

subsequently amended on March 14, 2013, by the Committee, together with BD/S (as

---

[5]      *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 2013 WL 1290394 (Sup. Ct. N.Y. Ctny. Mar. 8, 2013).

[6]      *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 112 A.D.3d 509, 978 N.Y.S.2d 10 (NY App. Div. 2013).  While the First Department's decision modified the trial court's decision by holding that there were triable issues of fact as to whether Black Diamond waived the ability to challenge Yucaipa's purported status as Requisite Lender, the modification was immaterial given there were no triable issues with respect to Spectrum's ability to challenge this.

[7]      *BDCM Opp. Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 8 N.E.3d 849, 22 N.Y.3d 1171 (N.Y. 2014).

126886857.1

intervenors).  The Lender Action was later filed on November 19, 2014.

96.     The Adversary Proceedings sought recovery of well over a hundred million dollars in damages for, among other things, Yucaipa's breach of the First Lien Credit Agreement's Capital Contribution requirement in an amount not less than $57,356,044.33 (plus pre-judgment interest accruing from the time of the breach on August 31, 2009), recovery and avoidance of millions of dollars of fraudulent transfers, damages from Yucaipa's breaches of fiduciary duties, and equitable subordination of Yucaipa's debt holdings.

97.     On August 8, 2013, Judge Sontchi, the presiding Judge over the Bankruptcy Case and Adversary Proceedings, granted partial summary judgment in the Estate Action — and a related adversary proceeding commenced by Allied — holding that: (1) BD/S, not Yucaipa, were Requisite Lenders, (2) the Third Amendment was validly enacted and governed, and (3) Yucaipa was collaterally estopped from asserting the Fourth Amendment's validity.  Yucaipa appealed these decisions and lost.  On March 31, 2016, the Delaware District Court issued a detailed decision affirming Judge Sontchi's grant of summary judgment.[8]   The Third Circuit affirmed this opinion on March 23, 2017.[9]

98.     Thus, by no later than spring 2017, Yucaipa knew that the Fourth Amendment to the First Lien Credit Agreement was finally determined to be void *ab initio*, and that the Third Amendment — including its stringent contractual conditions and the Capital Contribution requirement — were binding on it.  Indeed, Yucaipa's counsel admitted during a later hearing in the Adversary Proceedings that the result of these rulings necessarily meant that Yucaipa had breached the First Lien Credit Agreement, stating:

---

[8]     *In re Allied Sys. Holdings Inc.*, 556 B.R. 581, 608-09 (D. Del. 2016).

[9]     *In re ASHINC*, 683 Fed. App'x 131 (3d Cir. 2017).

126886857.1

[I]n hindsight we know the fourth amendment was void *ab initio*, so when Yucaipa acquired more than the third amendment allowed, that was a breach of the contract. The second breach is what we call the capital contribution provision . . . [T]en days after acquiring term loans [Yucaipa] needs to make a capital contribution; undisputed Yucaipa didn't do that.  And, again . . . in hindsight we know that that was required and it was a breach of the contract in failing to make the capital contribution within ten days.

99.    Moreover, by 2017, a string of adverse rulings against Yucaipa left it without a clear discernable defense to claims asserted in the Adversary Proceedings.  These rulings included the dismissal of Yucaipa's crossclaims and counterclaims asserted in the Adversary Proceedings (and a related adversary proceeding).  Additionally, Yucaipa filed plenary actions against BD/S and its employees in the U.S. District Court for the Southern District of New York and, later, in the U.S. District Court for the District of Delaware claiming RICO violations. These cases were also dismissed and Yucaipa's appeal to the Third Circuit to reinstate the Delaware RICO action was unsuccessful.[10]

100.    In early 2017, the Bankruptcy Court also issued an Order in the Lender Action striking a host of Yucaipa's affirmative defenses.

101.    Since the commencement of the Adversary Proceedings — and a related adversary proceeding brought by Allied in late 2012 — Yucaipa has not had a single substantive decision rendered in its favor.

102.    On or about February 3, 2017, Yucaipa and related entities and individuals filed a lawsuit against Houston Casualty Co., Lexington Insurance Co., and XL Specialty Insurance Co. in the Superior Court for the State of California for the County of Los Angeles (the "**Insurance**

---

[10]    *Yucaipa American Alliance Fund I, L.P. v. Ehrlich*, 204 F. Supp. 3d 765 (D. Del. 2016), *aff'd* 716 Fed. Appx. 73 (3d Cir. 2017)

**Coverage Litigation**").  In the Insurance Coverage Litigation, Yucaipa asserted claims for, among other things, breach of contract in connection with these carriers' denial of insurance coverage with respect to the Adversary Proceedings and related actions in which Yucaipa alleged it had already incurred, at that time, "fees that far exceed $20 million."

103.    Notwithstanding the pendency of the Adversary Proceedings (seeking hundreds of millions of dollars in damages), a string of unfavorable rulings issued in multiple courts between 2013 and 2017, and the pendency of the Insurance Coverage Litigation, Yucaipa transferred approximately $379.7 million to the Transferee Defendants between October 2017 and May 2019.

104.    This $379.7 million in transfers — outlined in Count One, below (the "**Transfers**") — included approximately $18.3 million Yucaipa distributed to insiders.[11]

105.    It belies common sense that Yucaipa and its General Partner concluded that it had "Available Assets" to make these Transfers in light of its liabilities.  Rather, by all appearances Yucaipa made the Transfers in an effort to render itself judgment proof from the Trustee.

106.    Moreover, Yucaipa did not receive any value — much less reasonably equivalent value — in exchange for the Transfers.

107.    In addition, the Transfers were made when Yucaipa was insolvent, or was rendered insolvent as a consequence of the Transfers, and accordingly Yucaipa was not allowed to issue distributions of this nature pursuant to applicable law.

## VI.    YUCAIPA'S ATTEMPTS TO CONCEAL THE TRANSFERS

108.    Yucaipa fought disclosing the Transfers to the Trustee for years.

---

[11]    On information and belief, the ultimate beneficiary of these transfers was Yucaipa's founder and principal, Ron Burkle.

109.    On or about May 15, 2019, the Trustee's counsel noticed a deposition to be taken of a corporate representative designated by Yucaipa, which was scheduled to commence on May 22, 2019.

110.    Among the topics noticed to be addressed by Yucaipa's corporate representative was Yucaipa's ability to satisfy any judgment issued in the Adversary Proceedings.

111.    On the evening of May 21, 2019, the night before the scheduled deposition, Yucaipa's counsel objected to, among other things, the corporate representative providing testimony on the topic of Yucaipa's ability to satisfy any judgment or about the Transferee Defendants.

112.    The next day, Yucaipa's corporate representative testified that he was not capable of addressing whether Yucaipa could satisfy any judgment in excess of $100 million.[12]

113.    In early 2020, the Trustee sought information regarding Yucaipa's distributions including the dates, amounts and recipients.  The Trustee explained to Yucaipa's counsel that, absent a voluntary turnover of this information, she would seek leave of the Bankruptcy Court to obtain it.

114.    After several meet and confer exchanges, Yucaipa took the position that it was not willing to provide the identity of recipients of distributions and required, as a pre-condition to any voluntary turnover of information it did provide, an agreement from the Trustee that she would not seek any additional discovery on these issues prior to any judgment issuing in the Adversary Proceedings.  The Trustee did not acquiesce to these limitations and filed a Motion for an Order permitting discovery into Yucaipa's distributions pursuant to Bankruptcy Rule 2004 on

---

[12]    Yucaipa, in fact, distributed over $242 million to the Transferee Defendants on May 3, 2019 — *i.e.*, less than three weeks prior to this deposition.

21

July 31, 2020 (the "**Rule 2004 Motion**").

115.    Yucaipa opposed the Rule 2004 Motion arguing, among other things, that the "identities of investors are the lifeblood of any fund" and that the "sensitivity of that information, and risks posed by its disclosure, are substantial."  Yucaipa further argued that the information sought is relevant to the Trustee "*only* if she were able to obtain a judgment against Yucaipa in the Adversary proceedings, and *only* if that judgment exceeded the approximately $45 million (not including interest) reserved under the Allied Plan for reimbursement of Yucaipa litigation fees and expenses and as Yucaipa's pro rata share of first lien Lender distributions."

116.    The Bankruptcy Court initially denied the Rule 2004 Motion without prejudice, noting that it would await an upcoming summary judgment argument in the Adversary Proceedings before revisiting.

117.    After the Bankruptcy Court entered an Opinion and Order on May 4, 2021 (the "**Summary Judgment Opinion and Order**") granting in part and denying in part the parties' respective summary judgment motions — and calling for submission of a judgment granting the Trustee damages exceeding $120 million — the Trustee sought a status conference to revisit the Rule 2004 Motion as soon as the Court's schedule permitted.

118.    In response, Yucaipa's counsel argued, again, that the relief sought in the Rule 2004 Motion was "premature and legally improper."  In seeking further delay from disclosure of the Transfers, Yucaipa's counsel maintained during a status conference on May 12, 2021, that the information sought "is the secret sauce of the fund" and should await entry of a proper Judgment.

119.    Yucaipa subsequently spent a month attacking the Bankruptcy Court's constitutional authority to enter any judgment and, later, sought a stay of enforcement of the

22

Judgment in the Bankruptcy Court and the District Court for the District of Delaware, all to no avail.

120.    The Bankruptcy Court granted the Trustee's Rule 2004 Motion on July 8, 2021 (the "**Rule 2004 Order**"), and Yucaipa made its initial production pursuant to the Rule 2004 Order on July 19, 2021.  The Transfers identified herein are derived from Yucaipa's business records produced pursuant to the Rule 2004 Order.

## VII.    THE JUDGMENT IS UNSATISFIED AND ENFORCEABLE

121.    The Bankruptcy Court issued the Judgment on June 23, 2021, granting the following damages to the Trustee:

a.    "Estate Claim 5 (Breach of Contract), in the amount of $57,356,044, plus prejudgment interest at the applicable New York simple interest rate of 9% per annum from August 31, 2009, through the date [of Judgment] in the amount of $60,983,814, making the total of the award and pre-judgment interest the amount of $118,339,858, with post-judgment interest accruing until the payment of the judgment is complete;" and,

b.    "Estate Claims 10 (Constructive Fraudulent Transfers), 11 (Constructive Fraudulent Transfers), and 13 (Disallowance of Claims), in the amount of $7,038,711, plus prejudgment interest in the amount of $7,053,387, based on quarterly compounded interest at the average Federal Reserve discount rate between the date of each transfer and the date [of Judgement] plus 5.0%, calculated from the date of each transfer through the date [of Judgment], making the total of the award and pre-judgment interest the amount of $14,092,099, with post-judgment interest accruing until the payment of the judgment is complete."

122.   On June 25, 2021, Yucaipa filed an emergency motion in the Bankruptcy Court seeking to stay the effectiveness and enforcement of the Judgment (the "**Initial Stay Motion**").

123.   The Bankruptcy Court granted Yucaipa's request to extend the automatic stay through July 14, 2021 (so Yucaipa could consider whether to post a *supersedeas* bond), but otherwise denied the Initial Stay Motion in a ruling from the bench on July 6, 2021.

124.   Yucaipa subsequently noticed appeals from the Judgment without posting any bond.  Instead, Yucaipa filed a second emergency motion to stay enforcement of the Judgment on July 13, 2021 (the "**Second Stay Motion**").  The District Court further extended the stay through and including August 3, 2021, and then subsequently denied Yuciapa's Second Stay Motion by an Opinion and Order dated August 2, 2021.

125.   The stay of enforcement of the Judgment has expired.

126.   No portion of the Judgment has been satisfied and Yucaipa has not posted any bond.

## VIII.   THE TRUSTEE'S REMAINING CLAIMS AGAINST YUCAIPA

127.   Following the Summary Judgment Opinion and Order, the Trustee's claims remaining for trial against Yucaipa include (1) the "exact extent to which Yucaipa's claims should be [equitably] subordinated," and (2) breach of fiduciary duty.

128.   In connection with these remaining claims, the Trustee is seeking recovery on behalf of Debtors' Estate of damages in excess of $300 million (with prejudgment interest).

### CAUSES OF ACTION

### COUNT ONE
### Violation the Uniform Fraudulent Transfer Act
### (Actual Fraud Against All Defendants)

129.   The Trustee repeats and realleges each and every allegation contained in the

foregoing paragraphs as if set forth at length herein.

130.    Upon information and belief, Yucaipa made the Transfers to Transferee-Defendants on or about October 11, 2017, October 10, 2018, March 15, 2019, and May 3, 2019.

131.    The transfers made by Yucaipa American Alliance Fund I, L.P. on October 11, 2017 are as follows:

     i.   $1,342,589 to NYCERS;

    ii.   $263,506 to Teachers' Retirement System of City of New York;

   iii.   $73,497 to New York City Police Pension Fund;

   iv.   $18,374 to New York City Fire Department Pension Fund;

    v.   $24,488 to New Mexico State Investment Council Severance Tax Permanent Fund;

   vi.   $48,967 to New Mexico State Investment Council Land Grant Permanent Fund;

   vii.   $402,367 to Los Angeles City Employees' Retirement System;

  viii.   $553,612 to Board of Fire and Police Pension Commissioners of the City of Los Angeles;

   ix.   $369,074 to American Private Equity Partners II, LP;

132.    The transfers made by Yucaipa American Alliance (Parallel) Fund I, L.P. on October 11, 2017 are as follows:

     i.   $1,516,327 to State Street Bank and Trust Company, as Trustee on behalf of American Airlines Master Fixed Benefit Pension Plan Trust;

    ii.   $1,446,066 to Coller Partners 702 LP Incorporated;

   iii.   $1,032,922 to Sanba II Investment Company;

   iv.   $826,329 to Northeast Carpenters Pension Fund;

   v.   $826,326 to Pacific Coast Roofers Pension Plan;

   vi.   $546,841 to United Food and Commercial Workers International Union Pension Plan for Employees;

   vii.   $424,200 to National Retirement Fund;

   viii.   $619,751 to Locals 302 & 612 Operating Engineers Retirement;

   ix.   $619,751 to Steamship Trade Association of Baltimore, Inc. – International Longshoremen's Association (AFL-CIO) Pension Fund;

   x.   $410,155 to Carpenters Pension Trust for Northern California;

   xi.   $619,751 to International SIF SICAVC SA;

   xii.   $413,163 to IAM Private Equity LLC;

   xiii.   $343,308 to ILGWU Death Benefit Fund 4;

   xiv.   $163,910 to Consolidated Retirement Fund;

   xv.   $80,816 to Automotive Machinists Pension Trust;

   xvi.   $1,367,113 to Western Conference of Teamsters Pension Trust Fund.

133.    The transfers made by Yucaipa American Alliance Fund I, L.P. on October 10, 2018 are as follows:

   i.   $6,119,782 to Yucaipa American Management, LLC;

   ii.   $39,061 to Yucaipa American Alliance Fund I, LLC;

   iii.   $31,248,549 to CalPERS;

   iv.   $14,061,847 to NYCERS;

   v.   $8,593,351 to Teachers' Retirement System of City of New York;

vi. $3,124,855 to New York City Police Pension Fund;

vii. $781,214 to New York City Fire Department Pension Fund;

viii. $2,083,237 to New Mexico State Investment Council Land Grant Permanent Fund

ix. $1,041,618 to New Mexico State Investment Council Severance Tax Permanent Fund;

x. $293,217 to Clouse, S.A;

xi. $1,562,427 to American Private Equity Partners II, LP;

xii. $2,343,641 to Board of Fire and Police Pension Commissioners of the City of Los Angeles;

xiii. $1,562,427 to Los Angeles City Employees' Retirement System;

134.    The transfers made by Yucaipa American Alliance (Parallel) Fund I, L.P. on October 10, 2018 are as follows:

i. $7,812,139 to Western Conference of Teamsters Pension Trust;

ii. $5,734,109 to State Street Bank and Trust Company, as Trustee on behalf of American Airlines Master Fixed Benefit Pension Plan Trust;

iii. $5,468,496 to Coller Partners 702 LP Incorporated;

iv. $3,546,852 to Sanba II Investment Company;

v. $3,124,855 to Northeast Carpenters Pension Fund;

vi. $3,124,855 to Pacific Coast Roofers Pension Plan;

vii. $3,124,855 to United Food and Commercial Workers International Union Pension Plan for Employees;

viii. $3,124,855 to National Retirement Fund;

27

ix.   $2,343,641 to Locals 302 & 612 Operating Engineers Retirement;

x.    $2,343,641 to Steamship Trade Association of Baltimore, Inc. –
International Longshoremen's Association (AFL-CIO) Pension Fund;

xi.   $2,343,641 to Carpenters Pension Trust for Northern California;

xii.  $2,128,110 to International SIF SICAVC SA;

xiii. $1,562,427 to IAM Private Equity, LLC;

xiv.  $1,562,427 to ILGWU Death Benefit Fund 4;

xv.   $1,562,427 to Consolidated Retirement Fund;

xvi.  $1,562,427 to Automotive Machinists Pension Trust; and,

xvii. $39,061 to Yucaipa American Alliance Fund I, LLC

135.   The transfers made by Yucaipa American Alliance Fund I, L.P. on March 15, 2019 are as follows:

i.    $14,724 to CalPERS;

ii.   $6,625 to NYCERS;

iii.  $4,049 to Teachers' Retirement System of City of New York;

iv.   $1,472 to New York City Police Pension Fund;

v.    $368 to New York City Fire Department Pension Fund;

vi.   $981 to New Mexico State Investment Council Land Grant Permanent
Fund

vii.  $491 to New Mexico State Investment Council Severance Tax Permanent
Fund;

viii. $147 to Clouse, S.A;

ix.   $736 to American Private Equity Partners II, LP;

    x. $1,104 to Board of Fire and Police Pension Commissioners of the City of Los Angeles;

    xi. $736 to Los Angeles City Employees' Retirement System;

136. The transfers made by Yucaipa American Alliance (Parallel) Fund I, L.P. on March 15, 2019 are as follows:

    i. $3,683 to Western Conference Teamsters Pension Trust;

    ii. $2,701 to State Street Bank and Trust Company, as Trustee on behalf of American Airlines Master Fixed Benefit Pension Plan Trust;

    iii. $2,576 to Coller Partners 702 LP Incorporated;

    iv. $1,840 to Sanba II Investment Company;

    v. $1,472 to Northeast Carpenters Pension Fund;

    vi. $1,472 to Pacific Coast Roofers Pension Plan;

    vii. $1,472 to United Food and Commercial Workers International Union Pension Plan for Employees;

    viii. $1,472 to National Retirement Fund;

    ix. $1,104 to Locals 302 & 612 Operating Engineers Retirement;

    x. $1,104 to Steamship Trade Association of Baltimore, Inc. – International Longshoremen's Association (AFL-CIO) Pension Fund;

    xi. $1,104 to Carpenters Pension Trust for Northern California;

    xii. $1,104 to International SIF SICAVC SA;

    xiii. $736 to IAM Private Equity, LLC;

    xiv. $736 to ILGWU Death Benefit Fund 4;

    xv. $736 to Consolidated Retirement Fund;

xvi.   $736 to Automotive Machinists Pension Trust; and,

137.   The transfers made by Yucaipa American Alliance Fund I, L.P. on May 3, 2019 are as follows:

i.   $61,011,071 to CalPERS;

ii.   $27,454,981 to NYCERS;

iii.   $16,778,044 to Teachers' Retirement System of City of New York;

iv.   $6,101,107 to New York City Police Pension Fund;

v.   $1,525,277 to New York City Fire Department Pension Fund;

vi.   $4,067,405 to New Mexico State Investment Council Land Grant Permanent Fund;

vii.   $2,033,702 to New Mexico State Investment Council Severance Tax Permanent Fund;

viii.   $610,111 to Clouse, S.A;

ix.   $3,050,553 to American Private Equity Partners II, LP;

x.   $4,575,830 to Board of Fire and Police Pension Commissioners of the City of Los Angeles;

xi.   $3,050,553 to Los Angeles City Employees' Retirement System;

xii.   $11,948,536 to Yucaipa American Management, LLC;

xiii.   $76,264 to Yucaipa American Alliance Fund I, LLC

138.   The transfers made by Yucaipa American Alliance (Parallel) Fund I, L.P. on May 3, 2019 are as follows:

i.   $15,252,771 to Western Conference of Teamsters Pension Trust;

ii.   $11,195,531 to State Street Bank and Trust Company, as Trustee on behalf

of American Airlines Master Fixed Benefit Pension Plan Trust;

iii.  $10,676,937 to Coller Partners 702 LP Incorporated;

iv.  $7,626,384 to Sanba II Investment Company;

v.  $6,101,107 to Northeast Carpenters Pension Fund;

vi.  $6,101,107 to Pacific Coast Roofers Pension Plan;

vii.  $6,101,107 to United Food and Commercial Workers International Union Pension Plan for Employees;

viii.  $6,101,107 to National Retirement Fund;

ix.  $4,575,830 to Locals 302 & 612 Operating Engineers Retirement;

x.  $4,575,830 to Steamship Trade Association of Baltimore, Inc. – International Longshoremen's Association (AFL-CIO) Pension Fund;

xi.  $4,575,830 to Carpenters Pension Trust for Northern California;

xii.  $4,575,830 to International SIF SICAVC SA;

xiii.  $3,050,553 to IAM Private Equity, LLC;

xiv.  $3,050,553 to ILGWU Death Benefit Fund 4;

xv.  $3,050,553 to Consolidated Retirement Fund;

xvi.  $3,050,553 to Automotive Machinists Pension Trust; and,

xvii.  $76,264 to Yucaipa American Alliance Fund I, LLC

139.    Any additional similar transfers made after the above Transfers would likewise be fraudulent transfers and the amount and recipient of any such transfers (such additional transfers are incorporated into the defined term "Transfers") will be determined during discovery and trial.

140.    Yucaipa made these Transfers with actual intent to hinder, delay, or defraud one or more of its creditors, including the Trustee, as manifest by some or all of the following

31

factors:

    a.   Certain Transfers were made to insiders of Yucaipa;

    b.   Yucaipa spent years actively trying to conceal the Transfers, including the identity of the transferees;

    c.   The Transfers were made after Yucaipa had been sued in the Adversary Proceedings and following a string of adverse decisions, including a final ruling that the Fourth Amendment to the First Lien Credit Agreement was void *ab initio*, and denial of insurance coverage;

    d.   The Transfers depleted substantially all of Yuciapa's assets;

    e.   There was no consideration or value received by Yucaipa on account of the Transfers; and,

    f.   The Transfers left Yucaipa insolvent with debts greater than its assets.

141.   Accordingly, the Transfers are avoidable as actual fraudulent transfers pursuant to 6 Del. C. § 1304(a)(1).

## COUNT TWO
### Violation of the Uniform Fraudulent Transfer Act
### (Constructive Fraud Against All Defendants)

142.   The Trustee repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

143.   Yucaipa did not receive reasonably equivalent value in exchange for the Transfers.

144.   At the time the Transfers were made, Yucaipa was insolvent (or would be rendered insolvent as a consequence of the Transfers), had unreasonably small capital, and/or believed, or reasonably should have believed, that it had incurred or would incur debts beyond its

ability to pay them.

145.    Accordingly, the Transfers are avoidable as constructively fraudulent transfers pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a).

**COUNT THREE**
**Declaration That General Partner Is Liable for**
**Judgment and/or Required to Seek Return of Distributions**

146.    The Trustee repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

147.    Yucaipa has not satisfied any amount due to the Trustee under the Judgment.

148.    The General Partner also has not satisfied any amount due to the Trustee under the Judgment notwithstanding that it is personally liable for the debts of the limited partnership under controlling law.

149.    Yucaipa declined the Trustee's request that it submit to entry of judgment against the General Partner for Yucaipa's unsatisfied debts owed to the Debtors' Estate.  Nor has the General Partner sought return of any of the Transfers pursuant to its rights to do so under the Partnership Agreements.

150.    Thus, a judgment should issue declaring the General Partner is liable for the debts of Yucaipa and requiring the General Partner seek return of Transfers to Transferee Defendants pursuant to Section 10.2(b) of the Partnership Agreements to satisfy the Judgment and any subsequent additional judgment that may issue in favor of the Trustee.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, the Trustee demands judgment in her favor and against the Defendants and requests an award of relief, including, but not limited to:

a.  Avoidance and recovery of the Transfers necessary to satisfy the Judgment and any

subsequent additional judgment that may be rendered against Yucaipa in favor of the Trustee, plus interest;

b.  A declaration that the General Partner is liable for the debts of Yucaipa and/or requiring the General Partner seek return of Transfers to Transferee Defendants pursuant to Section 10.2(b) of the Partnership Agreements to satisfy the Judgment;

c.  Pre-judgment interest, reasonable attorneys' fees and costs; and,

d.  Such other legal and equitable relief as this Court deems just.

126886857.1

Dated:  October 6, 2021

Respectfully submitted,


**FOX ROTHSCHILD LLP**


By:      */s/ Seth A. Niederman*
Seth A. Niederman (DE Bar No. 4588)
Citizens Bank Center
919 N. Market Street, Suite 300
Wilmington, DE 19801
Tel.: (302) 654-7444
Fax: (302) 656-8920
sniederman@foxrothschild.com

-and-

**JOSEPH HAGE AARONSON LLC**

Gregory P. Joseph
Douglas J. Pepe
Gila S. Singer
485 Lexington Avenue, 30th Floor
New York, NY 10017
Telephone: (212) 407-1200
gjoseph@jhany.com

-and-

**ZAIGER LLC**

Jeffrey H. Zaiger
Judd A. Lindenfeld
2187 Atlantic Street, 9th Floor
Stamford, CT 06902
Telephone: (917) 572-7701
jzaiger@zaigerllc.com

*Counsel for Plaintiff Catherine E. Youngman, Litigation Trustee and Plan Administrator*

126886857.1