Exhibit "1"

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Timothy Dillon

Electronically FILED by Superior Court of California, County of Los Angeles on 10/07/2021 05:39 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Miramontes,Deputy Clerk

KEITH C. OWENS (SBN 184841)
KOwens@FoxRothschild.com
JEFF H. GRANT (SBN 218974)
JGrant@FoxRothschild.com
MATTHEW FOLLETT (SBN 325481)
MFollett@FoxRothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:    310.598.4150
Facsimile:    310.556.9828

Attorneys for Plaintiff,
Catherine E. Youngman, Litigation Trustee
for ASHINC Corporation, et al.

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES

| | |
|---|---|
| CATHERINE E. YOUNGMAN, in her capacity as LITIGATION TRUSTEE FOR ASHINC CORPORATION, et al., as successor to THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS, | Case No. __21STCV37137__<br><br>**COMPLAINT FOR:**<br><br>**(1) FRAUDULENT TRANSFER (CAL. CIV. CODE § 3439.04(a)(1))** |
| Plaintiff, | **(2) CONSTRUCTIVE FRAUDULENT TRANSFER (CAL. CIV. CODE § 3439.04(a)(2))** |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, LLC, YUCAIPA AMERICAN MANAGEMENT, LLC; BOARD OF FIRE AND POLICE PENSION COMMISSIONERS OF THE CITY OF LOS ANGELES; CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM; CARPENTERS PENSION TRUST FOR NORTHERN CALIFORNIA; LOS ANGELES CITY EMPLOYEES RETIREMENT SYSTEM; PACIFIC COAST ROOFERS PENSION PLAN; and DOES 1-10, inclusive, | **(3) CONSTRUCTIVE FRAUDULENT TRANSFER - INSOLVENCY (CAL. CIV. CODE § 3439.05)** |
| Defendants. | |

1

COMPLAINT

126902786.2

1    Plaintiff Catherine E. Youngman, in her capacity as the Litigation Trustee and Plan

2   Administrator (the "Trustee" or "Plaintiff") for ASHINC Corp. (formerly known as Allied

3   Systems Holdings, Inc.) and related Debtors ("Allied," "Debtors," or the "Company"), by and

4
    through her undersigned counsel, hereby alleges against defendants Yucaipa American Alliance
5
6   Fund I, LLC; Yucaipa American Management, LLC; Board of Fire and Police Pension

7   Commissioners of the City of Los Angeles; California Public Employees' Retirement System;

8   Carpenters Pension Trust for Northern California; Los Angeles City Employees' Retirement

9   System; and, Pacific Coast Roofers Pension Plan (collectively, "Transferee Defendants" or

10  "Defendants'), and each of them, as follows.[1]

11
                                **NATURE OF THIS ACTION**
12
          1.    The Trustee is a judgment creditor against Yucaipa American Alliance Fund I,
13
14  L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (together "Yucaipa") in the amount of

15  $132,431,957.00, plus accruing post-judgment interest, pursuant to a Judgment entered by the

16  United States Bankruptcy Court for the District of Delaware on June 23, 2021 (the "Judgment")

17  in two related "Adversary Proceedings": (i) Del. Bankr. Adv. 13-50530 (the "Estate Action") and

18  (ii) Del Bankr. Adv. Adv. 14-50947 (the "Lender Action") (together the "Adversary

19  Proceedings").
20
          2.    Yucaipa has not satisfied the Judgment, and it has represented in court filings and
21
22  post-Judgment discovery responses that it does not have assets sufficient to pay the Judgment (let

23  alone sufficient assets to cover the far larger liability it continues to face with respect to claims

24  remaining for trial in the Adversary Proceedings).

25

26  [1]  On October 6, 2021, Plaintiff filed an Adversary Complaint in the United States Bankruptcy
    Court for the District of Delaware against, among others, the Defendants. Plaintiff respectfully
27  submits that these claims belong in that forum. The claims will not be prosecuted simultaneously
    in multiple forums; rather, this Complaint is filed to protect and preserve the Plaintiff's right to
28  have claims adjudicated before this Court if and to the extent it becomes necessary.

                                            2

126902786.2

3.      Yucaipa's inability to satisfy the Judgment is the function of it brazenly transferring nearly $380 million to its investors over the past several years notwithstanding the massive liability presented by the Adversary Proceedings and applicable law restricting such transfers. This includes over $140 million in transfers to the Defendants named in this lawsuit.

4.      Yucaipa's transfers to the Transferee Defendants were made at a time when, among other things, (i) the Adversary Proceedings were pending in the United States Bankruptcy Court for the District of Delaware, (ii) a string of adverse rulings against Yucaipa had issued in the Adversary Proceedings and related proceedings and appeals, (iii) Yucaipa was enmeshed in a lawsuit with insurance carriers over their denial of coverage for Yucaipa and its employees in connection with the Adversary Proceedings and related actions, and (iv) Yucaipa had already incurred legal-related expenses far exceeding $20 million. With legal challenges mounting in the face of the Trustee's claims to recover hundreds of millions of dollars, Yucaipa's transfers to the Transferee Defendants — leaving it insolvent — was a naked and intentional attempt to hinder, delay or defraud the Trustee's efforts and abilities to collect upon any judgment entered in the Adversary Proceedings.

5.      The transfers to the Transferee Defendants were also not made in return for any reasonably equivalent value or fair consideration at a time when Yucaipa was insolvent (or resulted in its insolvency), and when claims for money damages had been asserted against it in the Adversary Proceedings

6.      Thus, the transfers are subject to avoidance and return to the Trustee — to the extent needed to satisfy the Judgment or subsequent judgment entered — by way of this action.

## PARTIES

### The Plaintiff

7.      ASHINC Litigation Trust was created, and the Trustee was appointed, pursuant to

3

a Modified First Amended Joint Chapter 11 Plan of Reorganization (the "Plan")[2] confirmed in *In re ASHINC Corp.*, Case No. 12-11564 (CSS) (Bankr. Del.) (the "Bankruptcy Case").

8.       As a representative of the ASHINC Litigation Trust, as successor-in-interest to the Debtors' bankruptcy estates (the "Debtors' Estates"), the Trustee is authorized to prosecute, among other things, all claims asserted in the Adversary Proceedings and any additional claims of the Debtors' Estates arising out of or related thereto, including against any defendants not named therein.

**Yucaipa Transferee Defendants**

9.       Upon information and belief, defendant Yucaipa American Alliance Fund I, LLC (the "General Partner") is a Delaware limited liability company with its headquarters and principal place of business in Los Angeles, California.

10.      Upon information and belief, Yucaipa American Management, LLC is a Delaware Limited Liability Company with its headquarters and principal place of business in Los Angeles, California.

**Outside Transferee Defendants**

11.      Defendant Board of Fire and Police Pension Commissioners of the City of Los Angeles is an agency of the city of Los Angeles charged with administering the Fire and Police Pension Plan pursuant to Section 1106 of the Los Angeles City Charter. Its headquarters and principal place of business is in Los Angeles, California.

12.      Defendant California Public Employees' Retirement System ("CalPERS") is an agency of the State of California charged with administering a pension fund for state employees. Its headquarters and principal place of business is in Sacramento, California.

---

[2]       All terms not defined shall have the definitions ascribed to the in the Plan.

4

126902786.2

13.     Defendant Carpenters Pension Trust for Northern California is a private employee benefit plan created by a written trust agreement subject, and pursuant to, section 302 of the Labor Management Relations Act, and which is administered by a Board of Trustees. Its headquarters and principle place of business is in Oakland, California.

14.     Defendant Los Angeles City Employees' Retirement System is an agency of the City of Los Angeles charged with administering the pension and retirement system for civilian employees of the City of Los Angeles, except for the Department of Water and Power. Its headquarters and principal place of business in Los Angeles, California.

15.     Defendant Pacific Coast Roofers Pension Plan is a private pension plan headquartered at 6800 Santa Teresa Boulevard, Suite 100, San Jose, CA 95119.

16.     The true names Does 1 through 10, inclusive, are unknown to Plaintiff at this time. Plaintiff sues those defendants by such fictitious names pursuant to Cal. Code Civ. Proc § 410.10. Each of the defendants designated as a Doe defendant is alleged to be legally responsible for the damages that Plaintiff alleges herein. When the true names, involvement, and capacities of Does 1 through 10, inclusive, are ascertained, Plaintiff will seek leave to amend this Complaint accordingly.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the defendants pursuant to Cal. Code Civ. Proc § 410.10 because each is a California citizen.

18.     Venue is proper pursuant to Cal. Code Civ. Proc §§ 395 & 379 because some defendants have their principal places of business in Los Angeles County, and Plaintiff's right to relief stems from a series of transfers made by Yucaipa to all Transferee Defendants, all of which Plaintiff alleges that Yucaipa undertook with the intent to hinder, delay, or defraud Plaintiff of funds that the Debtors' Estates were either owed, or knew or had reason to know it would owe to

5

the Debtors' Estates.

## GENERAL ALLEGATIONS

### I.      YUCAIPA AND ITS PARTNERSHIP AGREEMENTS

19.     Defendants are sophisticated commercial parties who elected to invest in Yucaipa pursuant to Partnership Agreements entered into as of March 4, 2005.[3]

20.     The Defendants' stated objective in the Partnership Agreements' was to seek realization of "substantial capital gains" from private equity and/or equity-like transactions primarily in the range of $250 million to $1 billion.

21.     Under the Partnership Agreements, the General Partner is responsible for Yucaipa's investment decisions and engaging in activities that, "in its sole discretion" Yucaipa "deems necessary, advisable or incidental." The General Partner is also responsible for determining in good faith the Partnership's "Available Assets" which are defined as "excess of cash, cash equivalent items and temporary Investments held by the Partnership over the sum of the amount of such items determined by the General Partner to be reasonably necessary for the Payment of the Partnership's expenses, liabilities, and other obligations (whether fixed or contingent), and for the establishment of appropriate reserves for such expenses, liabilities and obligations as may arise, including the maintenance of adequate working capital for the continued conduct of the Partnership's business."

22.     Under the Partnership Agreements, distributions to the Transferee Defendants were permitted "only to the extent of Available Assets and in compliance with the Delaware

---

[3]     Yucaipa American Alliance Fund I, LP's operative Partnership Agreement is the Third Amended and Restated Limited Partnership Agreement entered into as of March 4, 2005, and Yucaipa American Alliance (Parallel) Fund I, LP's operative Partnership Agreement is the Amended and Restated Limited Partnership Agreement entered into as of March 4, 2005. These agreements are substantively identical and are referred to collectively as the "Partnership Agreements" for purposes of this Complaint.

6

1   Revised Uniform Limited Partnership Act and other applicable law."

2   **II.     YUCAIPA'S INVESTMENT AND CONTROLLING STAKE IN ALLIED**

3       **A.     Yucaipa's Initial Investments in Allied**

4       23.     Allied was a unionized car hauling company engaged in the transport of new

5   vehicles in North America.

6

7       24.     On July 31, 2005, Allied filed a petition for relief under Chapter 11 of the

8   Bankruptcy Code in the Bankruptcy Court for the Northern District of Georgia (the "2005

9   Bankruptcy").

10      25.     In early 2006, Yucaipa started analyzing a potential investment in Allied.

11      26.     Yucaipa thereafter elected to purchase approximately 66% of Allied's then-

12  outstanding $150 million in pre-petition senior notes for $81.6 million in May 2006. Yucaipa

13  also financed Allied's purchase of used rigs for approximately $12.6 million, and later purchased

14

15  $1.5 million in claims tendered by unsecured creditors for 25% of the face value of the claims.

16  Yucaipa's initial investments in Allied totaled approximately $95 million.

17      27.     Allied emerged from the 2005 Bankruptcy in 2007 under a Plan of Reorganization

18  sponsored by Yucaipa and the International Brotherhood of Teamsters. Yucaipa converted its

19  $95 million investment in Allied into 67% of the reorganized Allied's equity, giving Yucaipa the

20  ability to control Allied's Board of Directors (the "Board"), with the right to appoint three of

21  Allied's five Board members and Allied's Chief Executive Officer (the fourth Board member),

22

23  and veto power over Allied's fifth Board member, who was selected by Allied's Creditors'

24  Committee appointed in the 2005 Bankruptcy.

25      28.     Yucaipa appointed three of its partners to the Board and retained an executive

26  search firm to find a new CEO and fourth Board member of the Company. The fifth and final

27  member of the Allied Board was nominated by the Creditors' Committee and appointed after

28
                                            7

Yucaipa had rejected two prior selections.

**B.     Allied's Financing Upon Exiting the 2005 Bankruptcy**

29.     On May 29, 2007, Allied emerged from the 2005 Bankruptcy with $315 million in exit financing in a two-tiered structure with various lenders (the "Lenders") comprised of a $265 million senior secured priority "First Lien Facility" and a $50 million junior "Second Lien Facility" consisting of second lien term loans.[4]

30.     The First Lien Facility consisted of three types of debt: (1) term loans in the aggregate principal amount of $180 million; (2) a $35 million revolving credit facility from CIT Group/Business Credit, Inc. ("CIT"); and (3) $50 million in letters of credit. CIT also served as the Administrative Agent and Collateral Agent for the First Lien Facility.

31.     The First Lien Facility and Second Lien Facility were secured by a pledge of substantially all of Allied's assets, with both Credit Agreements containing fixed interest rates.

32.     The Georgia Bankruptcy Court approved the First Lien Facility and Second Lien Facility.

33.     The Court-approved Credit Agreements expressly excluded Yucaipa from being an "Eligible Assignee." This meant that Lenders could not sell, assign, or transfer any portion of their debt, rights, or obligations to Yucaipa. Further, the Credit Agreements provided for a "Requisite Lender" that was entitled to take certain actions and exercise particular remedies (or refrain from doing so) on behalf of all Lenders. Under the Credit Agreements, the Requisite Lender was one or more Lenders holding more than 50% of the outstanding loans. Given that Yucaipa could not be an "Eligible Assignee" under the Credit Agreements, it was plainly precluded from serving as a Requisite Lender.

---

[4]     The First Lien Credit Agreement and Second Lien Credit Agreement are collectively referred to as the "Credit Agreements" in this Complaint.

8

COMPLAINT

126902786.2

**C.  Yucaipa's Faltering Investment in Allied and
the Third Amendments to the Credit Agreements**

34.     Shortly after exiting the 2005 Bankruptcy in May 2007, Allied's financial condition once again began to deteriorate.

35.     In early 2008, Yucaipa began exploring the possibility of purchasing Allied's bank debt — then trading significantly below par — given what it perceived as a "dislocation in the marketplace" and in an effort to potentially de-lever Allied's balance sheet. Because the Credit Agreements did not permit Yucaipa to be an "Eligible Assignee," however, any such purchase first required amending the Credit Agreements.

36.     On April 17, 2008, Allied — with the requisite consent of CIT and the majority of the First Lien Lenders — agreed to the Third Amendment to the First Lien Credit Agreement (the "Third Amendment"). Under the Third Amendment, Yucaipa and its affiliates were permitted to purchase Allied's First Lien debt within specified limits and only if it satisfied stringent contractual conditions, including:

   a. **Purchase Limits.** The amount of Term Loans that Yucaipa could acquire was limited to the lesser of 25% of the total Term Loan Exposure (as defined in the Credit Agreements) or $50 million, and Yucaipa was barred from acquiring any Letter of Credit Commitments.

   b. **No Voting Rights or Right to Act as Requisite Lenders.** The voting rights Yucaipa would otherwise have as a Lender were restricted "for all purposes" under the Third Amendment, and Yucaipa — as a "Restricted Sponsor Affiliate[]" — remained barred from serving as Requisite Lender.

   c. **Mandatory Capital Contribution.** Yucaipa was required to make a capital contribution to Allied in an amount equal to 50% of the aggregate principal amount of any Term Loans it acquired, within 10 days of the acquisition (the "**Capital Contribution**").

   d. **Covenant Not to Sue.** Yucaipa's legal rights against the Lenders were restricted through a covenant not to sue.

37.     A Third Amendment to the Second Lien Facility was adopted on April 30, 2008.

9

COMPLAINT

126902786.2

Unlike the Third Amendment to the First Lien Facility, the amendment to the Second Lien Facility placed no restrictions on Yucaipa purchasing Second Lien Debt, and gave Yucaipa the unilateral option of converting some, or all, of its Second Lien holdings into equity.

38.      In or around April 30, 2008, Yucaipa purchased $40 million of Second Lien Debt — at significantly sub-par pricing — and converted $20 million of those debt holdings into Allied preferred stock. Upon conversion and cancellation of this debt, Allied's Second Lien Facility was reduced to $30 million, and Yucaipa's equity stake in the Company increased to slightly over 71%.

39.      Yucaipa's contribution and subsequent cancellation of Second Lien Debt did not create sufficient liquidity for the Company to satisfy the obligations to the First Lien Lenders. By June 2008, Allied had defaulted on covenant provisions of the First Lien Credit Agreement and was issued a Notice of Default and Reservation of Rights from CIT, as Agent for the First Lien Lenders, on September 3, 2008.

40.      Allied and several First Lien Lenders then entered into a Forbearance Agreement while they attempted to negotiate and address ongoing defaults. This Forbearance Agreement expired in mid-November 2008 without any agreement to restructure Allied's debt or cure its defaults, thus leaving the Lenders free to exercise remedies including accelerating their loans.

41.      Acceleration of the First Lien Debt following the expiration of the Forbearance Agreement would invariably have rendered Yucaipa's equity investment worthless, creating a significant loss for Defendants.

## III.      YUCAIPA'S ATTEMPTS TO BECOME REQUISITE LENDER

42.      With its Allied investment in peril, Yucaipa took aim at acquiring a majority of the First Lien Debt so it, ostensibly, could assume Requisite Lender position and control the exercise

10

126902786.2

1    of remedies (or lack thereof) provided for under the First Lien Credit Agreement.

2        43.    Yucaipa's goal of obtaining a majority of Allied's First Lien Debt, however,

3    required an amendment to the First Lien Credit Agreement to remove the restrictions now

4    embodied in the Third Amendment.

5
6        44.    In an effort to achieve this objective, Allied and Yucaipa launched a tender offer

7    on February 4, 2009, whereby Yucaipa sought to purchase any and all outstanding Allied First

8    Lien Debt at approximately 26% of the outstanding indebtedness (the "Tender Offer"). This

9    Tender Offer was conditioned, however, upon at least 51% of the First Lien Lenders accepting

10   the offer and agreeing to a fourth amendment to the First Lien Credit Agreement permitting

11   Yucaipa to hold and vote First Lien Debt without any of the restrictions imposed by the Third

12   Amendment.

13
14       45.    In a letter dated February 12, 2009, counsel for the First Lien Agent (CIT) wrote to

15   Allied and Yucaipa that the fourth amendment proposed with the Tender Offer "may not be

16   consummated on its present terms without the consent of each Agent", and advised that "CIT will

17   not grant consent, whether in its capacity as a Lender or as an Agent, to the Proposed Fourth

18   Amendment."

19
20       46.    Neither Allied nor Yucaipa ever responded to the February 12, 2009, letter from

21   CIT's counsel, and the Tender Offer was ultimately unsuccessful.

22       47.    On or about February 21, 2009, ComVest Investment Partners ("ComVest") —

23   who had been separately negotiating with Allied's First Lien Lenders — successfully acquired

24   more than 50% of Allied's First Lien Debt, becoming Requisite Lender under the First Lien

25   Credit Agreement.

26       48.    Over the course of the next six months, Yucaipa negotiated directly with ComVest

27   in an effort to purchase ComVest's majority stake in the First Lien Debt. As with the Tender

28                                                    11

                                              COMPLAINT

Offer, every transaction Yucaipa contemplated or proposed with ComVest required Allied and ComVest to enter an amendment removing the restrictions set forth in the Third Amendment.

49.     On August 21, 2009, Yucaipa and ComVest entered a Loan Purchase Agreement (the "LPA"), pursuant to which Yucaipa purchased ComVest's $145.1 million (principal face amount) for approximately $43 million.  Allied was not a party to the LPA, but the LPA's Closing Conditions required Allied to, among other things: (1) reimburse ComVest $1.85 million for its associated legal fees and expenses; (2) reimburse Yucaipa $831,325.83 for its legal fees and expenses; and (3) agree to the later-voided Fourth Amendment to the First Lien Credit Agreement (the "Fourth Amendment").

50.     Yucaipa did not make any capital contribution to Allied following its acquisition of ComVest's First Lien Debt.

51.     When the LPA was entered, the legality of the Fourth Amendment had already been brought into question by CIT — in its capacity as a Lender and Agent under the First Lien Facility — in its February 2009 letter.  Allied's counsel had also previously advised that any Fourth Amendment would "likely result in litigation against the Company," with Yucaipa as "the primary target of that litigation."

52.     Knowing that the Fourth Amendment would face legal challenges, Yucaipa developed a "Contingency Plan" focused on the "Validity of Amendment No. 4" with its litigation counsel contemporaneous with the execution of the LPA and Fourth Amendment.

**IV.     LITIGATION OVER THE FOURTH AMENDMENT AND ALLIED'S BANKRUPTCY**

53.     In fall 2009, Yucaipa sent direction letters to CIT claiming it was the "Requisite Lender" in connection with the First Lien Credit Agreement.

54.     CIT refused to recognize Yucaipa as Requisite Lender and, as such, did not abide by the directives Yucaipa issued.  In response, Yucaipa, together with Allied, sued CIT in

12

1    Georgia state court seeking, among other things, a declaratory judgment holding that the Fourth

2    Amendment was valid and that Yucaipa was Requisite Lender under the First Lien Credit

3    Agreement (the "Georgia Action").

4
        55.    On December 21, 2009, CIT filed counterclaims in the Georgia Action seeking,
5
6    among other things, a declaratory judgment that (i) the purported Fourth Amendment was

7    ineffective, (ii) the Third Amendment remained in full force and effect, and (iii) Yucaipa could

8    not be "Requisite Lenders" under the First Lien Credit Agreement.  CIT further sought specific

9    performance on behalf of the First Lien Lenders requiring Yucaipa to perform all of its covenants

10   and agreements in accordance with the Third Amendment to the First Lien Credit Agreement,

11   including the mandatory Capital Contribution.

12
        56.    In December 2011, CIT settled the Georgia Action on its own behalf, but expressly
13
14   not on behalf of any of Allied's other Lenders.

15       57.    On January 18, 2012, First Lien Lenders BDCM Opportunity Fund II, LP, Black

16   Diamond CLO 2005-1 Ltd. (collectively, "Black Diamond"), and Spectrum Investment Partners,

17   L.P. ("Spectrum" and together with Black Diamond, "BD/S"), filed a lawsuit in New York State

18   Court seeking a declaration that the Fourth Amendment was invalid and that Yucaipa was not the

19   Requisite Lender (the "NY Action").

20
         58.    On August 27, 2012, BD/S filed a motion for summary judgment in the NY
21
22   Action, arguing that the Fourth Amendment was not validly enacted because it had the effect of

23   changing the definition of Requisite Lenders and, therefore, it was an amendment requiring the

24   unanimous consent of all the Lenders under the First Lien Credit Agreement.

25       59.    On November 19, 2012, Justice Ramos of the New York Court ruled from the

26   bench and granted summary judgment in favor of BD/S, nullifying the Fourth Amendment.  The

27   New York Court observed that the Fourth Amendment was an impermissible attempt for Yucaipa
28
                                    13

1  to give itself "a free hand" and the ability to exercise "dictatorial powers with regard to [the]

2  loan."

3      60.    On March 8, 2013, Justice Ramos issued a written opinion to "amplif[y]" the oral

4  ruling issued on November 19, 2012. In this published opinion, Justice Ramos concluded, among

5

6  other things, that: (1) Yucaipa caused Allied to enter into the Fourth Amendment, which was

7  "flatly prohibited under the Credit Agreement;" (2) the Fourth Amendment "is not, and never

8  was, effective;" and (3) "Yucaipa [was] not the Requisite Lender."[5]

9      61.    The First Department of the New York Supreme Court's Appellate Division (the

10 "First Department") affirmed Justice Ramos' findings that the Fourth Amendment was void *ab*

11 *initio* and that Yucaipa is not the Requisite Lender.[6]  The New York Court of Appeals denied

12 further review on April 3, 2014, thereby exhausting Yucaipa's appeals.[7]

13

14     62.    On May 17, 2012, while the NY Action was ongoing, BD/S filed an involuntary

15 petition for bankruptcy against Allied. That filing was precipitated by Yucaipa's refusal to agree

16 to First Lien Lenders being treated ratably in a potential sale of Allied debt holdings to Allied's

17 competitor Jack Cooper Transport ("JCT"). At the time, Yucaipa was continuing to rely on its

18 fictitious Requisite Lender position to demand JCT pay it a significant premium to what was

19 offered contemporaneously to other Lenders.

20

21     63.    On June 10, 2012, Allied consented to entry of an order for relief and all Debtors

22

23 ---
[5]  *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 2013 WL 1290394
24 (Sup. Ct. N.Y. Ctny. Mar. 8, 2013).

25 [6]  *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 112 A.D.3d 509, 978
   N.Y.S.2d 10 (NY App. Div. 2013). While the First Department's decision modified the trial court's
26 decision by holding that there were triable issues of fact as to whether Black Diamond waived the
   ability to challenge Yucaipa's purported status as Requisite Lender, the modification was
   immaterial given there were no triable issues with respect to Spectrum's ability to challenge this.
27 [7]  *BDCM Opp. Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 8 N.E.3d 849, 22 N.Y.3d
28 1171 (N.Y. 2014).

14

126902786.2

1    filed voluntary petitions for relief in the Bankruptcy Case.

2    **V.      THE ADVERSARY PROCEEDINGS AND ADVERSE RULINGS AGAINST YUCAIPA**

3              64.     The Adversary Proceedings were commenced against Yucaipa, and others, by

4    Allied's Official Committee of Unsecured Creditors (the "Committee") on February 1, 2013, and

5    subsequently amended on March 14, 2013, by the Committee.  The Lender Action was later filed

6

7    on November 19, 2014.

8              65.     The Adversary Proceedings sought recovery of well over a hundred million dollars

9    in damages for, among other things, Yucaipa's breach of the First Lien Credit Agreement's

10   Capital Contribution requirement in an amount not less than $57,356,044.33 (plus pre-judgment

11   interest accruing from the time of the breach on August 31, 2009), recovery and avoidance of

12   millions of dollars of fraudulent transfers, damages from Yucaipa's breaches of fiduciary duties,

13

14   and equitable subordination of Yucaipa's debt holdings.

15             66.     On August 8, 2013, Judge Christopher Sontchi, the United States Bankruptcy

16   Judge presiding over the Bankruptcy Case and Adversary Proceedings, granted partial summary

17   judgment in the Estate Action — and a related adversary proceeding commenced by Allied —

18   holding that: (1) BD/S, not Yucaipa, were the Requisite Lenders; (2) the Third Amendment was

19   validly enacted and governed; and (3) Yucaipa was collaterally estopped from asserting the

20

21   Fourth Amendment's validity.  Yucaipa appealed these decisions and lost.  On March 31, 2016,

22   the U.S. District Court for the District of Delaware issued a detailed decision affirming Judge

23   Sontchi's grant of summary judgment.[8]  The Third Circuit affirmed this opinion on March 23,

24   2017.[9]

25             67.     Thus, by no later than Spring 2017, Yucaipa knew that the Fourth Amendment to

26

27   _____
     [8]    *In re Allied Sys. Holdings Inc.*, 556 B.R. 581 (D. Del. 2016).
     [9]    *In re ASHINC*, 683 Fed. App'x 131 (3d Cir. 2017).
28
                                                   15
     ────────────────────────────────────────────────────────
                                     COMPLAINT

126902786.2

the First Lien Credit Agreement was finally adjudicated to be void *ab initio*, and that the Third

Amendment — including its stringent contractual conditions and the Capital Contribution

requirement — were binding on Yucaipa. Indeed, Yucaipa's counsel admitted during a later

hearing in the Adversary Proceedings that the result of these rulings necessarily meant that

Yucaipa had breached the First Lien Credit Agreement, stating:

> [I]n hindsight we know the fourth amendment was void *ab initio*, so when Yucaipa acquired more than the third amendment allowed, that was a breach of the contract. The second breach is what we call the capital contribution provision . . . [T]en days after acquiring term loans [Yucaipa] needs to make a capital contribution; undisputed Yucaipa didn't do that. And, again . . . in hindsight we know that that was required and it was a breach of the contract in failing to make the capital contribution within ten days.[10]

68.     Moreover, by 2017, a string of adverse rulings against Yucaipa left it without a

clear discernable defense to claims asserted in the Adversary Proceedings. These rulings

included the dismissal of Yucaipa's crossclaims and counterclaims asserted in the Adversary

Proceedings (and a related adversary proceeding). Additionally, Yucaipa filed plenary actions

against BD/S and its employees in the U.S. District Court for the Southern District of New York

and, later, in the U.S. District Court for the District of Delaware claiming RICO violations. These

cases were also dismissed and Yucaipa's appeal to the Third Circuit to reinstate the Delaware

RICO action was unsuccessful.[11]

69.     In early 2017, the Bankruptcy Court also issued an Order in the Lender Action

striking a host of Yucaipa's affirmative defenses.

70.     Since the commencement of the Adversary Proceedings — and a related adversary

proceeding brought by Allied in late 2012 — Yucaipa has not had a single substantive decision

---

[10]     February 4, 2021 Tr. at 59:22-60:15.

[11]     *Yucaipa American Alliance Fund I, L.P. v. Ehrlich*, 204 F. Supp. 3d 765 (D. Del. 2016), *aff'd* 716 Fed. Appx. 73 (3d Cir. 2017)

16

1   rendered in its favor.

2       71.   On or about February 3, 2017, Yucaipa and certain related entities and individuals

3   filed a lawsuit against Houston Casualty Co., Lexington Insurance Co., and XL Specialty

4   Insurance Co. in the Superior Court for the State of California for the County of Los Angeles (the

5   "Insurance Coverage Litigation"). In the Insurance Coverage Litigation, Yucaipa asserted claims

6   for, among other things, breach of contract in connection with these carriers' denial of insurance

7   coverage with respect to the Adversary Proceedings and related actions in which Yucaipa alleged

8   it had already incurred, at that time, "fees that far exceed $20 million."

9       72.   Notwithstanding the pendency of the Adversary Proceedings (seeking hundreds of

10  millions of dollars in damages), a string of unfavorable rulings issued in multiple courts between

11  2013 and 2017, and the pendency of the Insurance Coverage Litigation, Yucaipa transferred

12  approximately $379.7 million between October 2017 and May 2019.

13

14

15      73.   These transfers of approximately $140.4 million to the Transferee Defendants —

16  as outlined in the First Cause of Action, below (the "Transfers") — included approximately $18.3

17  million Yucaipa distributed to insiders. [12]

18      74.   It belies common sense that Yucaipa and its General Partner concluded that it had

19  "Available Assets" to make these Transfers in light of its liabilities. Rather, by all appearances,

20  Yucaipa made the Transfers in an effort to render itself "judgment proof" from Plaintiff.

21

22      75.   Moreover, Yucaipa did not receive any value — much less reasonably equivalent

23  value — or fair consideration in exchange for the Transfers.

24      76.   In addition, the Transfers were made when the Adversary Proceedings were

25  pending and when Yucaipa was insolvent, or rendered insolvent, as a consequence of the

26

27  ───────────────
    [12]   On information and belief, the ultimate beneficiary of these transfers was Yucaipa's founder
    and principal, Ron Burkle.

28                                              17

                                        COMPLAINT

126902786.2

1  Transfers, and accordingly Yucaipa was not allowed to issue distributions of this nature pursuant

2  to applicable law.

3  **VI.    YUCAIPA'S ATTEMPTS TO CONCEAL THE TRANSFERS**

4      77.   Yucaipa fought disclosing the existence of the transfers to Plaintiff for years.

5

6      78.   On or about May 15, 2019, Plaintiff's counsel noticed a deposition to be taken of a

7  corporate representative designated by Yucaipa, which was scheduled to commence on May 22,

8  2019.

9      79.   Among the topics noticed to be addressed by Yucaipa's corporate representative

10  was Yucaipa's ability to satisfy any judgment issued in the Adversary Proceedings.

11      80.   On the evening of May 21, 2019, the night before the scheduled deposition,

12  Yucaipa's counsel objected to, among other things, the corporate representative providing

13

14  testimony on the topic of Yucaipa's ability to satisfy any judgment or about the Transferee

15  Defendants.

16      81.   The next day, Yucaipa's corporate representative testified that he was not capable

17  of addressing whether Yucaipa could satisfy any judgment in excess of $100 million.[13]

18      82.   In early 2020, Plaintiff sought information regarding Yucaipa's distributions

19  including the dates, amounts and recipients. Plaintiff explained to Yucaipa's counsel that, absent

20  a voluntary turnover of this information, she would seek leave of the Bankruptcy Court to obtain

21

22  it.

23      83.   After several meet and confer exchanges, Yucaipa took the position that it was not

24  willing to provide the identity of recipients of distributions and required, as a pre-condition to any

25  voluntary turnover of information it did provide, an agreement from Plaintiff that she would not

26

27  ---
[13]   Yucaipa, in fact, distributed over $242 million to Defendants, insiders and others on May

28  3, 2019 — *i.e.*, less than three weeks prior to this deposition.

18

COMPLAINT

126902786.2

1   seek any additional discovery on these issues prior to any judgment issuing in the Adversary

2   Proceedings. Plaintiff did not acquiesce to these limitations and filed a Motion for an Order

3   permitting discovery into Yucaipa's distributions pursuant to Federal Rule of Bankruptcy

4   Procedure 2004 on July 31, 2020 (the "Rule 2004 Motion").

5

6       84.    Yucaipa opposed the Rule 2004 Motion arguing, among other things, that the

7   "identities of investors are the lifeblood of any fund" and that the "sensitivity of that information,

8   and risks posed by its disclosure, are substantial." Yucaipa further argued that the information

9   sought is relevant to Plaintiff "*only* if she were able to obtain a judgment against Yucaipa in the

10  Adversary proceedings, and *only* if that judgment exceeded the approximately $45 million (not

11  including interest) reserved under the Allied Plan for reimbursement of Yucaipa litigation fees

12  and expenses and as Yucaipa's pro rata share of first lien Lender distributions."

13

14      85.    The Bankruptcy Court initially denied the Rule 2004 Motion without prejudice,

15  noting that it would await an upcoming summary judgment argument in the Adversary

16  Proceedings before revisiting.

17      86.    After the Bankruptcy Court entered an Opinion and Order on May 4, 2021 (the

18  "Summary Judgment Opinion and Order") granting in part and denying in part the parties'

19  respective summary judgment motions — and calling for submission of a judgment granting the

20  Trustee damages exceeding $120 million — Plaintiff sought a status conference to revisit the

21  Rule 2004 Motion as soon as the Court's schedule permitted.

22

23      87.    In response, Yucaipa's counsel argued, again, that the relief sought in the Rule

24  2004 Motion was "premature and legally improper." In seeking further delay from disclosure of

25  the transfers, Yucaipa's counsel maintained during a status conference on May 12, 2021, that the

26  information sought "is the secret sauce of the fund" and should await entry of a proper judgment.

27      88.    Yucaipa subsequently spent a month attacking the Bankruptcy Court's

28

                                        19
                                    COMPLAINT

1    constitutional authority to enter any judgment and, later, sought a stay of enforcement of the

2    Judgment in the Bankruptcy Court and the District Court for the District of Delaware, all to no

3    avail.

4

5         89.      The Bankruptcy Court granted Plaintiff's Rule 2004 Motion on July 8, 2021 (the

6    "Rule 2004 Order"), and Yucaipa made its initial production pursuant to the Rule 2004 Order on

7    July 19, 2021. The Transfers identified herein are derived from Yucaipa's business records

8    produced pursuant to the Rule 2004 Order.

9    **VII.**     **THE JUDGMENT IS UNSATISFIED AND ENFORCEABLE**

10        90.      The Bankruptcy Court issued the Judgment on June 23, 2021, granting Plaintiff

11    approximately $132.4 million in damages as follows:

12

13          a.   "Estate Claim 5 (Breach of Contract), in the amount of $57,356,044, plus

14              prejudgment interest at the applicable New York simple interest rate of 9% per

15              annum from August 31, 2009, through the date [of Judgment] in the amount of

16              $60,983,814, making the total of the award and pre-judgment interest the amount

17              of $118,339,858, with post-judgment interest accruing until the payment of the

18              judgment is complete;" and

19

20          b.   "Estate Claims 10 (Constructive Fraudulent Transfers), 11 (Constructive

21              Fraudulent Transfers), and 13 (Disallowance of Claims), in the amount of

22              $7,038,711, plus prejudgment interest in the amount of $7,053,387, based on

23              quarterly compounded interest at the average Federal Reserve discount rate

24              between the date of each transfer and the date [of Judgment] plus 5.0%, calculated

25              from the date of each transfer through the date [of Judgment], making the total of

26              the award and pre-judgment interest the amount of $14,092,099, with post-

27              judgment interest accruing until the payment of the judgment is complete."

28

91.   On June 25, 2021, Yucaipa filed an emergency motion in the Bankruptcy Court seeking to stay the effectiveness and enforcement of the Judgment (the "Initial Stay Motion").

92.   The Bankruptcy Court granted Yucaipa's request to extend the automatic stay through July 14, 2021 (so Yucaipa could consider whether to post a *supersedeas* bond), but otherwise denied the Initial Stay Motion in a ruling from the bench on July 6, 2021.

93.   Yucaipa subsequently noticed appeals from the Judgment without posting any bond. Instead, Yucaipa filed a second emergency motion to stay enforcement of the Judgment on July 13, 2021 (the "Second Stay Motion"). The District Court further extended the stay through and including August 3, 2021, and then subsequently denied Yucaipa's Second Stay Motion by and Opinion and Order dated August 2, 2021.

94.   The stay of enforcement of the Judgment has expired.

95.   No portion of the Judgment has been satisfied and Yucaipa has not posted any bond.

## VIII.   PLAINTIFF'S REMAINING CLAIMS AGAINST YUCAIPA

96.   Following the Summary Judgment Opinion and Order, Plaintiff's claims remaining for trial against Yucaipa include (1) the "exact extent to which Yucaipa's claims should be [equitably] subordinated," and (2) breach of fiduciary duty.

97.   In connection with these remaining claims, Plaintiff is seeking recovery on behalf of Debtors' Estate of damages (including prejudgment interest) in excess of $300 million.

### FIRST CAUSE OF ACTION

**Fraudulent Transfer**

**(Cal. Civ. Code § 3439.04(a)(1))**

**(Against All Defendants and Does 1-10, inclusive)**

98.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

21

1   99.   Upon information and belief, Yucaipa made the Transfers to Transferee

2   Defendants on or about October 11, 2017, October 10, 2018, March 15, 2019, and May 3, 2019

3   totaling $140,448,072.

4   100.   The relevant transfers made by Yucaipa American Alliance Fund I, L.P. on

5   October 11, 2017 are as follows:

6   i.   $553,612 to Board of Fire and Police Pension Commissioners of the City

7   of Los Angeles; and

8   ii.   $402,367 to Los Angeles City Employees' Retirement System.

9   101.   The relevant transfers made by Yucaipa American Alliance (Parallel) Fund I, L.P.

10   on October 11, 2017 are as follows:

11

12   i.   $826,326 to Pacific Coast Roofers Pension Plan; and,

13   ii.   $410,155 to Carpenters Pension Trust for Northern California.

14   102.   The relevant transfers made by Yucaipa American Alliance Fund I, L.P. on

15   October 10, 2018 are as follows:

16   i.   $31,248,549 to CalPERS;

17

18   ii.   $6,119,782 to Yucaipa American Management, LLC;

19   iii.   $2,343,641 to Board of Fire and Police Pension Commissioners of the City

20   of Los Angeles;

21   iv.   $1,562,427 to Los Angeles City Employees' Retirement System; and

22   v.   $39,061 to Yucaipa American Alliance Fund I, LLC.

23   103.   The relevant transfers made by Yucaipa American Alliance (Parallel) Fund I, L.P.

24   on October 10, 2018 are as follows:

25

26   i.   $3,124,855 to Pacific Coast Roofers Pension Plan;

27   ii.   $2,343,641 to Carpenters Pension Trust for Northern California; and,

28

22

COMPLAINT

126902786.2

iii. $39,061 to Yucaipa American Alliance Fund I, LLC.

104. The relevant transfers made by Yucaipa American Alliance Fund I, L.P. on March 15, 2019 are as follows:

    i. $14,724 to CalPERS;

    ii. $1,104 to Board of Fire and Police Pension Commissioners of the City of Los Angeles; and,

    iii. $736 to Los Angeles City Employees' Retirement System.

105. The relevant transfer made by Yucaipa American Alliance (Parallel) Fund I, L.P. on March 15, 2019 is as follows:

    i. $1,472 to Pacific Coast Roofers Pension Plan; and

    ii. $1,104 to Carpenters Pension Trust for Northern California.

106. The relevant transfers made by Yucaipa American Alliance Fund I, L.P. on May 3, 2019 are as follows:

    i. $61,011,071 to CalPERS;

    ii. $11,948,536 to Yucaipa American Management, LLC;

    iii. $4,575,830 to Board of Fire and Police Pension Commissioners of the City of Los Angeles;

    iv. $3,050,553 to Los Angeles City Employees' Retirement System; and

    v. $76,264 to Yucaipa American Alliance Fund I, LLC.

107. The relevant transfer made by Yucaipa American Alliance (Parallel) Fund I, L.P. on May 3, 2019 is as follows:

    i. $6,101,107 to Pacific Coast Roofers Pension Plan;

    ii. $4,575,830 to Carpenters Pension Trust for Northern California; and,

    iii. $76,264 to Yucaipa American Alliance Fund I, LLC.

23

COMPLAINT

126902786.2

108.    Any additional similar transfers made after the above Transfers are, on information and belief, also fraudulent transfers and the amount and recipient of any such transfers (such additional transfers are incorporated into the defined term "Transfers") will be determined during discovery and trial.

109.    Yucaipa made these Transfers with actual intent to hinder, delay, or defraud one or more of its creditors, including Plaintiff, as manifest by some or all of the following factors:

a.    Certain Transfers were made to insiders of Yucaipa;

b.    Yucaipa spent years actively trying to conceal the Transfers, including the identity of the transferees;

c.    The Transfers were made after Yucaipa had been sued in the Adversary Proceedings and following a string of adverse decisions, including a final ruling that the Fourth Amendment to the First Lien Credit Agreement was void *ab initio*, and the denial of insurance coverage;

d.    The Transfers at issue were among transfers that depleted substantially all of Yucaipa's assets;

e.    Yucaipa did not receive any consideration or value on account of the Transfers; and,

f.    The Transfers left Yucaipa insolvent with debts greater than its assets.

110.    As a result of the Adversary Proceedings, Plaintiff is a creditor with a right to payment from Yucaipa. Yucaipa, however, made the Transfers to Defendants, which was the substantial cause of damages to Plaintiff because she cannot collect from Yucaipa what she is owed. Yucaipa made the transfers with the intent to hinder, delay, or defraud Plaintiff. Accordingly, the Transfers are fraudulent pursuant to Cal. Civ. Code § 3439.04(a)(1).

24

126902786.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CAUSE OF ACTION

**Constructive Fraudulent Transfer**

**(Cal. Civ. Code § 3439.04(a)(2))**

**(Against All Defendants and Does 1-10, inclusive)**

111.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

112.   Plaintiff had a right to payment from Yucaipa.

113.   Yucaipa made the Transfers to the Transferee Defendants but did not receive reasonably equivalent value in exchange for them;.

114.   At the time the Transfers were made, Yucaipa believed, or should have reasonably believed, that it would incur debts stemming from the Adversarial Proceedings beyond Yucaipa's ability to pay as they became due.

115.   Because of the Transfers, Plaintiff was substantially harmed since it could not collect from Yucaipa what it was owed. Accordingly, the Transfers are voidable as constructively fraudulent transfers pursuant to Cal. Civ. Code § 3439.04(a)(2)).

## THIRD CAUSE OF ACTION

**Constructive Fraudulent Transfer - Insolvency**

**(Cal. Civ. Code § 3439.05)**
**(Against Transferee Defendants and Does 1-10, inclusive)**

116.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if set forth at length herein.

117.   Plaintiff had a right to payment from Yucaipa.

118.   Yucaipa made the Transfers to the Transferee Defendants but did not receive reasonably equivalent value in exchange for them;

119.   At the time of the Transfers, Yucaipa was insolvent or became insolvent and

25

126902786.2

1   unable to fulfill its monetary obligations to Plaintiff as a result of the Transfers.

2       120.    Because of the Transfers, Plaintiff was substantially harmed since it could not

3   collect from Yucaipa the obligation that it was owed. Accordingly, the Transfers are

4   Constructively Fraudulent pursuant to Cal. Civ. Code § 3439.05.

5

6                          **PRAYER FOR RELIEF**

7       WHEREFORE, Plaintiff prays for judgment against each defendant as follows:

8       a.  An order that the Transfers from Yucaipa to the Transferee Defendants be set aside to

9           the extent necessary to satisfy the Judgment and any subsequent judgment that may

10          rendered against Yucaipa;

11      b.  Pre-judgment interest;

12      c.  Costs of suit incurred;

13      d.  Reasonable attorneys' fees; and

14

15      e.  Such other legal and equitable relief as this Court deems just.

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    26

126902786.2

1    Dated: October 7, 2021                    **FOX ROTHSCHILD LLP**

2
                                              */s/ Keith C. Owens*
3                                             Keith C. Owens
                                              Jeff H. Grant
4                                             Matthew Follett

5                                             -and-

6                                             **JOSEPH HAGE AARONSON LLC**
                                              Gregory P. Joseph
7                                             Douglas J. Pepe
                                              Gila S. Singer
8                                             485 Lexington Avenue, 30th Floor
                                              New York, NY 10017
9                                             Tel: 212-407-1200
                                              (*Pro Hac Applications Forthcoming*)

10                                            -and-

11                                            **ZAIGER LLC**
                                              Jeffrey H. Zaiger
12                                            Judd A. Lindenfeld
                                              2187 Atlantic Street, 9th Floor
13                                            Stamford, CT 06902
                                              Tel: 203-347-7180
14                                            (*Pro Hac Applications Forthcoming*)

15                                            *Attorneys for Plaintiff*
                                              *Catherine E. Youngman, solely in her capacity*
16                                            *as Litigation Trustee for Ashinc Corporation,*
                                              *et al.*
17

18

19

20

21

22

23

24

25

26

27

28
                                        27
                                    COMPLAINT

126902786.2